**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 8, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 8, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

IN RE THE MARRIAGE OF:

MARINA P. WILCOX,

Respondent,

and

MATTHEW EMERY WILCOX,

Petitioner.

No. 102401-1

En Banc

Filed: August 8, 2024

WHITENER, J. — This is the second appeal in this matter. Matthew Wilcox seeks review of an unpublished court of appeals decision that affirmed the trial court's spousal maintenance award of $4,000 per month for 11 years to Marina Palomarez (formerly known as Wilcox). The question presented is whether a trial court abuses its wide discretion when it awards spousal maintenance in an amount and duration that exceeds the requesting spouse's needs.

We hold that while a trial court must consider a requesting spouse's need for support before awarding maintenance, among the other statutory factors listed in RCW 26.09.090, a finding of need is not a *prerequisite* to a maintenance award. Here, the trial court did not abuse its wide discretion in awarding Palomarez

maintenance payments in the amount of $4,000 per month for a period of 11 years because the trial court considered the particular circumstances of this case and all of the statutory factors set forth in RCW 26.09.090. Accordingly, we affirm the Court of Appeals.

FACTS

I. FACTUAL BACKGROUND

Palomarez and Wilcox married in October 1994, separated in July 2015, and obtained a dissolution decree in May 2019. Clerk's Papers (CP) at 83, 733, 736. The parties' agreed and the court categorized their more than 20 year marriage as a "'long-term' marriage." CP at 736-37.

Wilcox has a bachelor of science degree in psychology with a minor in business from Washington State University. CP at 182, 192. Palomarez graduated from Sunnyside High School and attended Heritage College for one year but did not acquire any degrees. CP at 334.

During the marriage, the parties purchased a family home in Yakima. CP at 738, 740. At the time of separation, the mortgage debt was approximately $34,000 and was paid off during this divorce action in June 2018. CP at 396.

During the marriage, the parties lived a secure, middle-class lifestyle. CP at 750, 855. They dined out two to three times a week and took a vacation once a year. CP at 360-61. Together they raised two children, now adults, and the children are not at issue in this matter. CP at 737.

A.    Palomarez's Employment History

Between 1994 and 1997, Palomarez worked as a receptionist for various employers. CP at 335-36. In 1997, she worked part-time for a dentist but was fired during her second pregnancy. CP at 336. Shortly thereafter, the parties agreed that she would not return to work and would stay home to raise their two children. CP at 336-37; Ex. 53.18, at 3.

In 2004, Palomarez returned to work but worked only on a part-time basis until 2007. CP at 337; Ex. 53.18 at 3. Her net income in 2004 was $1,900; in 2005, $8,842; in 2006, $8,718; and in 2007, $10,485. Ex. 53.18, at 3. From 2009 to 2017, Palomarez worked as a receptionist for another pediatric dentist until she was terminated during the pendency of this divorce action. CP at 337. Palomarez worked various other receptionist-type jobs for several employers, and as of October 2020, she worked in the customer service call center for Costco. CP at 337-38, 764.

On average between 2011 and 2017, Palomarez earned just $30,000 per year. CP at 738; Ex. 53.18. According to her financial declaration filed in October 2021, she makes $2,840 per month (exclusive of spousal maintenance payments), while her expenses totaled $2,719 per month. CP at 764-65.

Palomarez is bilingual in English and Spanish. CP at 405-06. She explored becoming a court reporter but had been informed by a recruiter that demand was low. CP at 362. At the time of the trial she had not exerted efforts in leveraging her bilingual skills in finding employment because she was in the middle of a divorce. CP at 406.

B.     Wilcox's Employment History

Wilcox worked at Graham Packaging from 1994 to 2008. CP at 184-85. He was employed as the production manager and earned approximately $75,000 per year, which included benefits and a modest bonus. CP at 737.

In 2008, the parties sought to purchase Knotts Power Sports, which is located in Yakima, for $400,000. CP at 743-44. However, the lending market tightened up at this time, and, as a result, the parties could not secure conventional financing to purchase the business. CP at 744. The parties financed the purchase through a $300,000 loan from Kathryn Hosack, Wilcox's mother, and a $100,000 loan from

the owner-seller. CP at 745. The parties purchased the business to provide Wilcox with employment and a dependable salary. CP at 744-45. By January 2019, the parties owed Hosack $250,000 at 5 percent interest, and the $100,000 loan from the owner-seller was repaid. CP at 747.

The business is now known as Premier Power Sports. CP at 746. Wilcox has managed it since its purchase and testified at trial that he planned to work for an additional 15 to 20 years. CP at 185, 746-747.

During the first six years of operation, the business "struggled immensely." CP at 186. Premier Power Sports reported $2,586 in losses in 2009; and reported net income of $29,095 in 2010; $16,329 in 2011; $49,617 in 2012; $75,787 in 2013; and $52,917 in 2014. Exs. 14-20.

In 2014, the parties converted Premier Power Sports from a limited liability company to an S corporation. CP at 221. In 2015, the year that the parties separated, the business saw substantial gains. In 2015, it reported ordinary business income of $158,761; in 2016, $192,760; and in 2017, $167,390. Exs. 22, 24, 26; CP at 780. During these years, and despite these increases in reported ordinary business income, Wilcox's salary as the manager increased only nominally. During all financial years, Wilcox reported income from Premier Power Sports only in the amount of $34,000

to $40,000 per year, regardless of the actual net income of the business. The corporation, at the direction of Wilcox, retained a substantial portion of its earnings. CP at 743, 750, 780; Exs. 20-26.

The income from Premier Power Sports paid some of Wilcox's personal expenses and approximately $4,000 per year for community expenses. CP at 747. The business paid for a Dodge Ram pickup truck that Wilcox uses, vehicle insurance, gasoline, and cell phone bills. CP at 196, 198-202, 560-61. After the parties separated, the business paid spousal maintenance Wilcox owed Palomarez, as well as his attorney fees and expert witness fees. CP at 209-10, 322. He also bartered with other service providers for car repairs and dental care. CP at 203-04, 674.

II.    PROCEDURAL HISTORY

In August 2015, Palomarez filed a divorce petition. CP at 3. Wilcox paid $2,500 in temporary spousal maintenance and some child support until their youngest child attended college. CP at 406; Ex. 5.

At trial, each party hired an expert witness to testify about the value of Premier Power Sports. Palomarez's expert appraised the business at $522,000, and Wilcox's expert appraised it at $335,000. CP at 228, 462. The trial court awarded the business to Wilcox (valued at $500,000 but encumbered by $250,000 in debt), and awarded

Palomarez the family home (unencumbered by debt), a vehicle, a SERS (State Employees' Retirement System) Plan 3 State of Washington Retirement plan, a 401(k) from Wilcox's first career at Graham Packaging, a Morgan Stanley investment account, and a deferred pension plan also from Graham Packaging. CP at 85-86, 737-38, 749. In total, the court awarded Wilcox property valued at approximately $506,250 and awarded Palomarez property valued at approximately $381,166, exclusive of respective debts.[1]

The trial court awarded spousal maintenance, calculating Wilcox's income to be $40,000 per year, despite the fact that the business reported income much higher than that amount. CP at 750. The court reasoned that it did not wish to overrule Wilcox's business judgment as to the amount of earnings to retain in the business. *Id*. Based on his reported income, the trial court ordered Wilcox to pay $1,000 per month in spousal maintenance for four years, until the end of 2022, at which point Palomarez could begin collecting from the Graham Packaging pension that she was awarded in the divorce decree. CP at 750-51.

---

[1] The respective property values are drawn from the Court of Appeals' decision in *Palomarez v. Wilcox*, 15 Wn. App. 2d 187, 190, 475 P.3d 512 (2020) (published in part), which is the first appeal in this case. Neither party disputes the accuracy of these property values.

7

Palomarez appealed, and the Court of Appeals reversed. *Palomarez v. Wilcox*, 15 Wn. App. 2d 187, 189, 475 P.3d 512 (2020) (published in part). The court held that the trial court erred in setting Wilcox's income at $40,000 per year. *Id*. at 194-95. It remanded the spousal maintenance award for reconsideration with instructions to consider that Wilcox's expenses paid by the business must be counted as income, as well as retained earnings in a closely held corporation. *Id*. The court also directed the trial court to readdress the property division award due to errors related to credits and offsets. *Wilcox*, No. 36842-4-III, slip op. (unpublished portion) at 10-11, http://www.courts.wa.gov/opinions/pdf/368424_pub.pdf. The court expressed concern about the overall property division award, stating that "the only significant income-producing asset was granted to the husband, [thus] the property disparity is actually greater and will grow over time"—closer to 60-40 in favor of Wilcox. *Id*. at 12. Thus, it opined that "[t]he trial court necessarily will have to reconsider the total property division and determine whether a transfer payment or some other arrangement is appropriate when issuing the new property award." *Id*.

On remand, a different judge presided over the matter because the trial judge had since retired. The new judge issued a pretrial order stating in part that

> 1. At this point, trial of the above matter will be based on the existing record from the Trial court and the Mandate from the Court of Appeals.

> No further testimony will be taken. Since neither party challenged the value of any assets or liabilities, the value of those assets and liabilities will remain as found by the original trial court at the time of separation.
>
> 2. The issues to be addressed at trial from the Mandate include determination of Respondent's income at the time of the original trial, spousal maintenance addressing RCW 26.09.090 factors at time of trial, [and] division of assets and liabilities.

CP at 160 (boldface omitted).

On remand, the trial court largely affirmed the first trial judge's division of property and allocation of liabilities, finding it just and equitable. CP at 783, 860-61. The exception was that on remand, the judge took the Graham Packaging pension that the first trial judge previously had awarded entirely to Palomarez and divided it in half between the parties. CP at 783, 860-61. This change reflected Palomarez's community property interest in the pension and treated the asset as property to be divided rather than income to be substituted for spousal maintenance. CP at 783. In total, the trial court on remand awarded Palomarez property valued at $403,708 and Wilcox property valued at $515,793. *Id*.

The trial court calculated spousal maintenance, using Wilcox's income as $156,000 annually ($13,000 per month), which he does not challenge. CP at 781, 855. The court then awarded Palomarez $4,000 per month in spousal maintenance for 11 years, until she turned 65, unless she remarried or either spouse died first. CP

at 855. The court entered lengthy findings in its order, outlining the factors in RCW

26.09.090:

The financial resources of the party seeking maintenance, including separate or community property apportioned to her, and her ability to meet her needs independently: The trial court apportioned Ms. Palomares the family home (at trial it was unencumbered by debt), a 401(k) retirement plan, a SERS Plan 3 State of Washington retirement plan, and a reliable vehicle. Ms. Palomares had no other separate property. He[r] employable salary is $30,000 annually.

The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment: The trial court did not estimate an amount of time for retraining and there is no evidence that Ms. Palomares seeks retraining. The trial court found she had substantial experience working as a receptionist or performing data entry. She may realize higher income by marketing her bilingual skills.

The standard of living established during the marriage: The family lived a secure, modest middle-class lifestyle. They owned a comfortable home. They drove reliable vehicles. Occasionally, they enjoyed out-of-town leisure trips and eating out. They acquired household furnishings, tools, and sport vehicles. They were able to maintain their lifestyle without acquiring debt. Instead, they used the business's social and financial capital to cover out-of-ordinary expenses, such as repairing vehicles and paying for travel for children's sports.

The duration of the marriage: The parties agree they married in October, 1994 and separated in July 2015. They had been married 20 years and 9 months at separation, but at the time of trial in January 2019 it was over 24 years.

The age, physical and emotional condition, and financial obligations of the spouse seeking maintenance: Ms. Palomares was 51 at the time of

trial. There was no evidence of any physical or emotional condition limiting her ability to work. However, at her age and with her professional experience, her income earning potential is not expected to increase substantially from historical levels.

The ability of the spouse from whom maintenance is sought to meet his needs and financial obligations while meeting those of the spouse seeking maintenance: Mr. Wilcox expected to work 15-20 years from the time of trial. There are no health concerns. The family's business was awarded to him. The business was valued at about $500,000. The business supported the community during the marriage, and the income increased steadily. After separation, the business grew substantially. Mr. Wilcox had no consumer debts and takes pride in living within his means, debt-free. There may be periods where Mr. Wilcox must re-invest business income due to meet cash flow needs. This court finds Mr. Wilcox's income for spousal maintenance purposes to be $156,000 annually, or $13,000 gross per month.

Taking into account all the statutory factors, and since the Court of Appeals fully reversed the spousal maintenance award, the court believes spousal support should be set at $4,000 per month beginning February 1, 2019 and be payable on the first day of each month thereafter until Ms. Palomares turns 65, or she remarries, or either party dies, whichever occurs first.

CP at 854-55.

Wilcox appealed the maintenance award, arguing that a requesting spouse is entitled to maintenance only to the extent necessary. *In re Marriage of Wilcox*, No. 38790-9-III, slip op. at 15-18 (Wash. Ct. App. Aug. 24, 2023) (unpublished) http://www.courts.wa.gov/opinions/pdf/387909_ord.pdf. The Court of Appeals affirmed. *Id*. Wilcox now petitions this court for review, which we granted.

ANALYSIS

I.  STANDARD OF REVIEW

The trial court exercises broad discretionary powers in awarding maintenance and its disposition will not be overturned on appeal absent a showing of manifest abuse of discretion.  *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984).  "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons."  *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 563, 446 P.3d 635 (2019).

This case also involves an issue of statutory interpretation, which is a question of law subject to de novo review.  *In Marriage of Zandi*, 187 Wn.2d 921, 926, 391 P.3d 429 (2017). "The purpose of our inquiry is to identify and give effect to the legislative intent behind the statute."  *Id*. at 926-27.  "If possible, we 'must give effect to [the] plain meaning [of a statute] as an expression of legislative intent.'"  *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014) (alterations in original) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).  "We may use a dictionary to discern the plain meaning of an undefined statutory term."  *Nissen v. Pierce County*, 183 Wn.2d 863, 881, 357 P.3d

45 (2015). "If the plain meaning of a statute is unambiguous, our inquiry ends." *Zandi*, 187 Wn.2d at 927.

## II.      A BRIEF HISTORY OF SPOUSAL SUPPORT AWARDS IN WASHINGTON

Prior to 1973, Washington courts observed the concept of "alimony" in marital dissolution cases. *See, e.g.*, LAWS OF 1949, ch. 215, § 11. "Alimony" is defined as "[a] court-ordered allowance that one spouse pays to the other spouse for maintenance and support while they are separated, while they are involved in a matrimonial lawsuit, or after they are divorced; esp[ecially], money that a court orders someone to pay regularly to his or her former spouse after the marriage has ended." BLACK'S LAW DICTIONARY 92 (11th ed. 2019). It is "distinct from a property settlement." *Id*. In Washington, no statute set forth specific criterion for a trial court to consider before awarding alimony. *See, e.g.*, LAWS OF 1949, ch. 215, § 11. Instead, the criterion for the allowance of alimony developed through the common law. *See, e.g.*, Cynthia L. Greene, *Alimony Is Not Forever: Self-Sufficiency and Permanent Alimony*, 4 J. AM. ACAD. MATRIM. LAW. 9, 10 (1988) (stating that "[t]he concept of alimony reached the United States through English common law"). Long-standing precedent held that alimony was not awarded as a matter of right, *Holloway v. Holloway*, 69 Wn.2d 243, 252, 417 P.2d 961 (1966), and depended on

a showing of two factors: "[1] the necessities of the one party and [2] the ability of the other to meet that necessity." *Herrett v. Herrett*, 80 Wash. 474, 478, 141 P. 1158 (1914); *see also Holcomb v. Holcomb*, 53 Wash. 611, 613, 102 P. 653 (1909). A decision to award alimony was "one which to a considerable extent [lay] within the discretion of the trial court." *Murray v. Murray*, 26 Wn.2d 370, 378, 174 P.2d 296 (1946).

According to decisions of this court, the public policy in this state *required* that alimony be need based, and it was intended to be temporary in nature until the requesting spouse became self-supporting. *See, e.g.*, *Kelso v. Kelso*, 75 Wn.2d 24, 27, 448 P.2d 499 (1968) ("Unless there is need there should be no alimony. That is the public policy in this state."); *Holloway*, 69 Wn.2d at 252-53 ("'Alimony is not a matter of right. When the [spouse] has the ability to earn a living, it is not the policy of the law of this state to give [them] a perpetual lien on [their] divorced [spouse]'s future income.'" (quoting *Morgan v. Morgan*, 59 Wn.2d 639, 642, 369 P.2d 516 (1962))); *Berg v. Berg*, 72 Wn.2d 532, 533, 434 P.2d 1 (1967) (accord); *Hogberg v. Hogberg*, 64 Wn.2d 617, 619, 393 P.2d 291 (1964) (accord); *Endres v. Endres*, 62 Wn.2d 55, 56, 380 P.2d 873 (1963) ("The needs of [one spouse] and the financial ability of the [other spouse] to pay are the essential elements which govern the

14

granting of an alimony award."); *Dakin v. Dakin*, 62 Wn.2d 687, 691-92, 384 P.2d 639 (1963); *Morgan*, 59 Wn.2d at 642; *Warning v. Warning*, 40 Wn.2d 903, 905-06, 247 P.2d 249 (1952); *Luithle v. Luithle*, 23 Wn.2d 494, 502, 161 P.2d 152 (1945); *Underwood v. Underwood*, 162 Wash. 204, 208, 298 P. 318 (1931). While alimony was intended to be temporary in nature, permanent or long-term alimony could also be ordered, but this occurred only "under the most unusual circumstances"—usually when the requesting spouse had no ability to work. *Lockhart v. Lockhart*, 145 Wash. 210, 213, 259 P. 385 (1927).

In 1973, the legislature overhauled how spousal support is awarded by enacting the dissolution of marriage act, which is now codified in chapter 26.09 RCW. LAWS OF 1973, 1st Ex. Sess., ch. 157, § 9. As a result of this legislation, "[a]limony is no longer awarded in Washington." *In re Marriage of McLean*, 132 Wn.2d 301, 310 n.4, 937 P.2d 602 (1997). Instead, "[s]pousal maintenance may be awarded." *Id*.

III.   WHILE A REQUESTING SPOUSE'S NEED MUST BE CONSIDERED, IT IS NOT A PREREQUISITE TO AN AWARD OF MAINTENANCE

Spousal maintenance awards are now governed by RCW 26.09.090. That statute provides:

(1) In a proceeding for dissolution of marriage or domestic partnership, legal separation, declaration of invalidity, or in a proceeding for maintenance following dissolution of the marriage or domestic partnership by a court which lacked personal jurisdiction over the absent spouse or absent domestic partner, the court may grant a maintenance order for either spouse or either domestic partner. The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, <u>after considering all relevant factors including but not limited to</u>:

    (a) <u>The financial resources of the party seeking maintenance,</u> including separate or community property apportioned to him or her, <u>and his or her ability to meet his or her needs independently,</u> including the extent to which a provision for support of a child living with the party includes a sum for that party;

    (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

    (c) The standard of living established during the marriage or domestic partnership;

    (d) The duration of the marriage or domestic partnership;

    (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

    (f) <u>The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.</u>

RCW 26.09.090 (emphasis added).

"Under this provision, the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." *Washburn*, 101 Wn.2d at 178. An award of maintenance is meant

16

to be "a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *Id*. at 179. Ultimately, the court's paramount concern must be the parties' economic conditions postdissolution. *Id*. at 181. Thus, in instances "[w]here the assets of the parties are insufficient to permit compensation to be effected entirely through property division, a supplemental award of maintenance [may be] appropriate." *Id*. at 178. "Maintenance not based on a fair consideration of the statutory factors constitutes an abuse of discretion." *Anthony*, 9 Wn. App. 2d at 564.

Wilcox argues that the purpose of maintenance is to support a spouse until they are able to become self-sufficient and that a party seeking maintenance is required to demonstrate a need for support. Pet'r's Suppl. Br. at 11-19. According to Wilcox, a trial court abuses its discretion when it awards spousal maintenance absent a finding of need. *Id*. To support his proposition, he relies primarily on decisions from this court that predate RCW 26.09.090, such as *Kelso*, 75 Wn.2d 24, which are discussed above. He also relies on a number of Court of Appeals decisions that postdate RCW 26.09.090 which recite the need-based language of the *Kelso* line of cases, such as *In re Marriage of Olsen*, 24 Wn. App. 292, 299 n.2, 600 P.2d 690 (1979); *In re Marriage of Irwin*, 64 Wn. App. 38, 55, 822 P.2d 797 (1992); *In re*

17

*Marriage of Rouleau*, 36 Wn. App. 129, 132, 672 P.2d 756 (1983); *In re Marriage of Mathews*, 70 Wn. App. 116, 124, 853 P.2d 462 (1993); *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994); *In re Marriage of Foley*, 84 Wn. App. 839, 845-46, 930 P.2d 929 (1997); *In re Marriage of Valente*, 179 Wn. App. 817, 825, 320 P.3d 115 (2014); *In re Marriage of Rookard*, No. 55051-2-II, slip op. at 3-4 (Wash. Ct. App. Dec. 14, 2021) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2055051-2-II%20Unpublished%20Opinion.pdf; *In re Marriage of McMaster*, No. 37176-0-III, slip op. at 10-11 (Wash. Ct. App. Mar. 8, 2022) (unpublished), http://www.courts.wa.gov/opinion/pdf/371760_unp.pdf, *aff'd* 21 Wn. App. 2d 1016 (2022).

The Court of Appeals here held that the requesting spouse does not have to demonstrate financial need for a maintenance award. *Wilcox*, No. 38790-9-III, slip op. at 15-22. The court reasoned that *Kelso* holds precedential value only as to the first of the factors recited above (the financial resources of the requesting spouse) because that case, and the cases it relied on, was decided before the adoption of the dissolution of marriage act, from which RCW 26.09.090 arises. *Id.* at 16. The court also reasoned that while RCW 26.09.090 lists the need of the requesting spouse as

18

one factor to consider, it does not authorize an award of maintenance *only if* the proponent establishes need. *Id*. at 15-18. Thus, because the trial court considered all of the statutory factors above, it concluded that the trial court did not abuse its discretion in its maintenance award. *Id*. at 18-19.

We agree in result. *Kelso* and its line of cases are instructive as the legislative changes that occurred after that case merged the need and ability to pay requirement as a factor to be considered. The plain language of RCW 26.09.090(1) provides that the court needs only to "consider" the requesting spouse's financial resources, along with the other statutory factors, before awarding maintenance. The term "consider" is undefined by statute, but it is commonly understood to mean: "**1 :** to reflect on **:** think about with a degree of care or caution … **2 :** to think of, regard, or treat in an attentive, solicitous, or kindly way." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 483 (2002). This stands in stark contrast with the two-factor test used by Washington courts prior to the enactment of RCW 26.09.090, which as discussed above *required* a finding of need before awarding alimony. "[T]he legislature is presumed to know the existing state of the case law in those areas in which it is legislating." *Woodson v. State*, 95 Wn.2d 257, 262, 623 P.2d 683 (1980). By changing the criterion for awarding maintenance from requiring a finding of need to

only considering need, the court must presume the legislature intended a change in the law. *See, e.g.*, *Chandler v. Otto*, 103 Wn.2d 268, 274, 693 P.2d 71 (1984). Accordingly, because the plain language of RCW 26.09.090 requires the court to only consider, among the other statutory factors, a requesting spouse's need for support, establishing need is not a prerequisite to a maintenance award.

This conclusion is further supported by our decision in *Washburn*, 101 Wn.2d 168. There, we stated that "under the extremely flexible provisions of RCW 26.09.090, a demonstrated capacity of self-support *does not automatically preclude* an award of maintenance." *Id*. at 178 (emphasis added). Rather, "the ability of the spouse seeking maintenance to meet his or her needs independently is only *one* factor to be considered," and the provisions as a whole made it clear that "maintenance is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *Id*. at 178-79. In essence, we opined that no one factor is necessarily assigned more weight than the other and the court's paramount concern is instead the parties' "economic condition[s]" postdissolution. *Id*. at 181. Thus, *Washburn* is consistent with the analysis demonstrated above and drives the result here.

Additionally, while not addressed by the parties, our conclusion is also supported when comparing the language of RCW 26.09.090 to the uniform marriage and divorce act (UMDA) of 1973. The language of section 308 of the UMDA, which deals with maintenance, is substantially similar to RCW 26.09.090. Indeed, the legislative committee that drafted the bill that became the dissolution of marriage act received guidance from UMDA. *See* Luvern V. Rieke, *The Dissolution Act of 1973: From Status to Contract?*, 49 WASH. L. REV. 375, 382 n.32 (1974). However, when the legislature enacted RCW 26.09.090, it omitted adding in subsection 308(a), which would have codified the common law requirement in Washington that alimony must be based on the requesting spouse's need. Thus, by omitting this subsection, the legislature intended a change in how spousal maintenance is awarded not by requiring need, rather only considering that fact or lack thereof. *See, e.g.*, *Chandler*, 103 Wn.2d at 274.

Accordingly, we hold that while a requesting spouse's need must be considered among the other statutory factors before awarding maintenance, it is not a prerequisite to a maintenance award.

IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION AND WILCOX'S REMAINING ARGUMENTS ARE WITHOUT MERIT

Wilcox argues that large maintenance awards, like the one here, are only justified in cases involving "special circumstances," such as when the requesting spouse has no ability to work, received an insufficient property division award due to misappropriation, or helped the other spouse gain a professional degree. Pet'r's Suppl. Br. at 19-25 (citing *In re Marriage of Leaver*, 20 Wn. App. 2d 228, 499 P.3d 222 (2021), *In re Marriage of Morrow*, 53 Wn. App. 579, 770 P.2d 197 (1989), and *Washburn*, 101 Wn.2d 168). According to Wilcox, since none of these special circumstances apply here, the trial court abused its discretion in blindly awarding long-term maintenance that exceeds Palomarez's bare needs and the standard of living achieved during the marriage. Pet'r's Suppl. Br. at 19-25. We disagree.

Wilcox's attempt to narrow the circumstances justifying a large maintenance award based on decisional law is unpersuasive. Spousal maintenance awards are not governed by a fixed rule but necessarily depend on the facts and circumstances of each case. *Dakin*, 62 Wn.2d at 691; *see also* RCW 26.09.090(1) (stating that "[t]he maintenance order shall be in such amounts and for such periods of time as the court deems just"). Additionally, *Morrow* undercuts Wilcox's argument in part because the court there recognized that "[a] spouse's 'demonstrated capacity of self-support

does not automatically preclude an award of maintenance.'" 53 Wn. App. at 585 (quoting *Washburn*, 101 Wn.2d at 178). Furthermore, while a professional degree is not at issue, the reasoning underlying the *Washburn* decision applies with equal force here because Palomarez was not fairly compensated for the success of Premier Power Sports and the parties' long-term marriage.

In *Washburn*, we held that "[t]he contribution of the supporting spouse to the attainment of a professional degree by the student spouse is a factor to be considered in … awarding maintenance pursuant to RCW 26.09.090." 101 Wn.2d at 170. There, we reasoned that the factors in the statute are not exclusive, that maintenance is meant to be a flexible tool to equalize the parties' standard of living for a limited time, and that the ultimate concern is the award's "fairness as determined by those factors set out in RCW 26.09.090." *Id*. at 182. On the point of fairness, we recognized situations where "a marriage endures for some time after the professional degree is obtained" such that "the supporting spouse may already have benefited financially from the student spouse's increased earning capacity to an extent that would make extra compensation inappropriate." *Id*. at 181. However, in situations where the marriage is dissolved before the supporting spouse has realized a return on their investment in family prosperity, we observed that "'an unfairness has

occurred that calls for a remedy.'" *Id.* at 182 (quoting *Mahoney v. Mahoney*, 91 N.J. 488, 500, 453 A.2d 527 (1982)). Therefore, depending on the circumstances, the requesting spouse may be entitled to compensation for their contributions in helping their former spouse obtain a professional degree through an award of maintenance.

At its core, *Washburn* stands for the proposition that in situations where one spouse supports the other spouse's economic undertaking with the mutual expectation of future financial benefit to the community, but the marriage ends before that benefit can be realized, that circumstance should be considered when awarding maintenance. This is especially so where the assets of the parties are insufficient to permit fair compensation to be affected entirely through property division. Accordingly, the fact that a professional degree is not at issue here does not preclude *Washburn*'s applicability.

Here, like *Washburn*, the trial court recognized that an unfairness occurred that called for a remedy. The record shows that Palomarez stayed home to raise the children and worked only part-time receptionist jobs for nearly half of the marriage. CP at 335-37; Ex. 53.18, at 3. When the parties acquired Premier Power Sports, Palomarez began working for a pediatric dentist. CP at 337. Her income increased during this time, suggesting that she worked full-time to help support the family as

24

the business struggled during its first six years of operation.  CP at 186, 738, 854-55; Ex. 53.18.   While the trial court found that Palomarez could realize a higher income if she leveraged her bilingual skills, it also found that given her age and professional experience, her earning potential was not expected to increase substantially from historical levels, which is only $30,000 annually.  CP at 854-55.  However, shortly after the parties separated, the business grew significantly along with Wilcox's income, which the trial court found to be $156,000 annually.  CP at 855.  The trial court also found that Wilcox would work for an additional 15 to 20 years and recognized that the only significant income producing asset, which was meant to support the community, was awarded to him.  *Id*.  Thus, based in part on the disparate earning power of the parties and the fact that the business grew substantially after separation, the trial court ordered an equalization payment to Palomarez in the amount of $4,000 per month until she turned 65—or 11 years.  CP at 854-55.  The trial court did so after a fair consideration of all the factors set forth in RCW 26.09.090 and the particular circumstances present in this case, which Wilcox does not dispute.  *Id*.  Accordingly, under the specific circumstances here, we hold that the trial court did not abuse its discretion in its maintenance award.

Wilcox also seems to argue that the trial court abused its discretion in issuing a large maintenance award because it failed to consider that he *only* received the business whereas Palomarez received *all other* community assets in the property division award. *See* Pet'r's Suppl. Br. at 23. We disagree.

As explained above, "the economic condition in which a dissolution decree leaves the parties is a *paramount concern* in determining issues of property division and maintenance." *Washburn*, 101 Wn.2d at 181 (emphasis added). Thus, "[w]here the assets of the parties are insufficient to permit compensation to be effected entirely through property division, a supplemental award of maintenance is appropriate." *Id*. at 178.

Here, Wilcox's argument is unpersuasive because he fails to acknowledge that the business is worth far more than all of the other community assets combined. Indeed, the trial court on remand awarded Palomarez property valued at $403,708 and Wilcox property valued at $515,793, which is more than a $100,000 disparity. CP at 783. Therefore, absent a supplemental award of maintenance, Palomarez would be left in a far worse economic condition than Wilcox. In fact, since the only significant income-producing asset was granted to Wilcox, the property disparity is actually greater than it appears and will grow over time. The trial court was aware

that it awarded an unequal property distribution in favor of Wilcox, thus to counteract this inequity, it exercised its discretion by awarding maintenance in a way that equalizes the standard of living for both parties for a limited time. The trial court's method of utilizing a supplemental award of maintenance to offset an unequal property division award is permissible under *Washburn* and the specific circumstances here. Accordingly, the trial court did not abuse its discretion in its maintenance award.

Next, relying on *In re Marriage of Anglin*, 52 Wn. App. 317, 759 P.2d 1224 (1988), Wilcox argues that a trial court may not "equalize" the spouses' future income using maintenance awards because earning potential is not an asset to be divided among the former spouses. Pet'r's Suppl. Br. at 20. However, Wilcox's reliance on *Anglin* fails because that case dealt with a property division award, not a spousal maintenance award.

Wilcox also argues that reversal is necessary because long-term marriages do not require long-term maintenance awards. Pet'r's Suppl. Br. at 25-27 (discussing *In re Marriage of Rockwell*, 141 Wn. App. 235, 170 P.3d 572 (2007)). Wilcox is correct that nothing in RCW 26.09.090 requires long-term maintenance awards for long-term marriages, like the one here. However, RCW 26.09.090(1) states that the

court "may" grant a maintenance order for either spouse and "for such periods of time as the court deems just," after considering all statutory factors. The term "may" is construed as permissive. *Scannell v. City of Seattle*, 97 Wn.2d 701, 704-05, 648 P.2d 435 (1982). Thus, while not required, the court has the *discretion* to set a long-term award so long as it fairly considers all of the statutory factors and the circumstances present in the case, which the court did here. *See, e.g.*, *Dakin*, 62 Wn.2d at 691; RCW 26.09.090. Accordingly, this argument fails.

Wilcox further argues that the trial court's maintenance award would allow Palomarez to quit her job and still have an income that exceeds her expenses. Pet'r's Suppl. Br. at 27-28. According to Wilcox, this necessitates reversal because it creates "bad policy" and undermines the purpose of spousal maintenance awards. *Id*. However, "such policy debates are for the legislature to resolve, not the courts." *State v. Costich*, 152 Wn.2d 463, 479, 98 P.3d 795 (2004). In any event, Wilcox's argument fails because, as discussed above, under flexible provisions of RCW 26.09.090, "a demonstrated capacity of self-support does not automatically preclude an award of maintenance." *Washburn*, 101 Wn.2d at 178. Accordingly, reversal is not warranted on this ground.

Finally, relying on *In re Marriage of Barnett*, 63 Wn. App. 385, 818 P.2d 1382 (1991), Wilcox briefly argues that by ordering a long-term maintenance award, the trial court impermissibly "double dipped" on the only asset he received. Pet'r's Suppl. Br. at 28-29. We disagree because, unlike *Barnett*, the trial court here did not effectively award the same property division twice to Palomarez.

CONCLUSION

We hold that establishing need is not a prerequisite to a spousal maintenance award, but rather, it is to be considered among the other statutory factors set forth in RCW 26.09.090. Here, the trial court considered all of the factors under RCW 26.09.090 and the special circumstances governing this case. Thus, the trial court did not abuse its wide discretion in awarding spousal maintenance. Accordingly, we affirm the Court of Appeals.

Whitener, J.

WE CONCUR.

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.