# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>AMY ELIZABETH ATHERTON,<br><br>Petitioner,<br><br>v.<br><br>JASON RAY ATHERTON,<br><br>Respondent. | No.  59728-4-II<br><br><br>UNPUBLISHED OPINION |

PRICE, J. — Jason Atherton and Amy Atherton divorced after about 14 years of marriage.[1]
Following a dissolution trial and as part of its final orders, the trial court ordered Jason to pay Amy
$3,000 per month in spousal maintenance for 5 years.

Jason appeals, arguing that the trial court failed to properly consider the statutory factors
for spousal maintenance and, accordingly, abused its discretion in entering the amount and
duration of its maintenance award.

We disagree and affirm.

## FACTS

### I. BACKGROUND

Jason and Amy were married in 2008.  In 2022, Amy petitioned for dissolution.  Jason and
Amy had four children together during the marriage and owned two homes.  In addition to the two

---

[1] We refer to the parties by their first names to avoid confusion.  We mean no disrespect.

homes, Jason and Amy owned other assets, including, among other things, bank accounts, cars, and consumer electronics. Prior to trial, the court entered preliminary orders that required Jason to pay Amy $3,600 per month in temporary spousal maintenance and $1,576 per month in temporary child support.

II. TRIAL

The dissolution trial focused on three main issues—property division, spousal maintenance, and child support. Amy was the first witness to testify.

In addition to the facts set forth above, Amy testified about her educational background and her decision to leave the workforce. She explained that she had earned a bachelor's degree as well as a master's degree from the University of Washington in education with a teaching certificate. Amy initially worked as a teacher early in the marriage but stopped working after she became pregnant with their second child in 2012. At that point, Amy stayed home and took care of the children, eventually having a total of four children. Amy was not employed in full-time work outside the home until after the parties had separated.

Amy testified that after the parties separated, she returned to work as a teacher for a private school, earning a salary of $51,000 per year. Amy explained that this teaching position was the only job that she was offered after applying to at least 50 positions. Amy was 41 years old at the time of her testimony.

With respect to the value of their real property, Amy testified that the couple purchased their first home in 2018. In 2020, they purchased a second home (a "nice home in the north end of Tacoma") into which they eventually moved with the children. Verbatim Rep. of Proc. (VRP) at 63. The second home, where Amy and the four children resided at the time of trial, had an

2

appraised value of $625,000. Amy testified that she paid $4,141.46 per month for the second home's mortgage, taxes, and insurance. The first home was rented to tenants who offered to buy it for $500,000.

As for their standard of living, Amy testified that beyond the ownership of the homes, the family had been on a few vacations and the children did extracurricular activities which were expensive. Amy also explained that she anticipated incurring additional childcare costs after the dissolution of the marriage.

Another topic of Amy's testimony was Jason's income. Amy explained that Jason owned and operated a company that conducted fundraising called "Atherton Scale Company." VRP at 29. Amy testified that Jason would do one or two fundraising campaigns per year that brought in about $30,000-$60,000 of income. Amy also testified that Jason received one or two bonuses from his employer, Best Buy, in the amount of $30,000-$50,000 per year.

Amy requested that the trial court award her spousal maintenance of $3,000 per month for three years.

Jason took the stand next. He testified that he had been employed by Best Buy since 2021 and had a current salary of approximately $140,000. Jason also testified that his gross monthly income was $13,476 and that he had $4,930.51 in deductions from his paycheck. Jason acknowledged that he had a high income, but testified that the family was living "paycheck to paycheck" due to high amounts of spending. VRP at 206. Despite Jason's high income, he had testified that he only worked two hours per day (although he denied he had capacity to fill work hours with other employment). With respect to his separate business, Atherton Scale, Jason testified that the company was not profitable, made little income, and had no contracts for 2023

3

and 2024. He said that he did not expect to continue operating the company because it was "a lot of work for very little pay." VRP at 230. As for bonuses, Jason said that he received a one-time bonus from Best Buy based on the company's performance as a whole during the pandemic, but that the bonuses were not recurring. Jason did not contradict Amy's testimony about the monthly payments associated with the second home, but he added that the rental home's mortgage was approximately $2,000 per month.

## III. TRIAL COURT'S ORAL RULING

Following the testimony and evidence, the trial court issued its decision with a lengthy oral ruling. First addressing property division, the trial court found that each party had a 50 percent community property interest in both homes. The trial court awarded the first home (the rental property) to Jason minus Amy's community property interest, and the second home (where Amy and the children resided at the time of trial) to Amy minus Jason's community property interest. The trial court also divided up the parties' other assets and debts, including various bank accounts, cars, and personal property. The trial court listed the assets and put them in two groups for allocation to each party, but it did not assign specific values to each asset.

Following the trial court's property division decision, the trial court discussed Jason's income for the purposes of calculating child support. The trial court excluded potential future bonuses from Best Buy because it decided that these bonuses were beyond Jason's control. The trial court also excluded any potential income from Jason's business, Atherton Scale, because it found Jason's testimony credible that suggested he did not intend to pursue the business any further.

4

After excluding these potential sources of income from Jason's income for the purposes of calculating child support, the trial court switched to addressing spousal maintenance. During this part of its oral ruling, the trial court appeared to track each statutory factor relevant to imposing a maintenance award.[2]

Among the factors that the trial court must consider is the financial resources of the person requesting maintenance. The trial court observed that Amy testified that she had been out of the job market for many years when she stayed at home to care for the children. From the testimony that Amy unsuccessfully applied for many jobs, the trial court noted that Amy had to take anything that was offered because of the length of time that she had been out of the workforce. Accordingly, the trial court found that it was likely that Amy's income was lower than if she had remained in her profession. The trial court also found that Amy's income was significantly lower than Jason's income.

After addressing Amy's financial resources, the trial court evaluated the time necessary for Amy to acquire sufficient education or training to enable her to find employment appropriate to her skills, interest, style of live, and other attendant circumstances. The trial court found that "it will take time for [Amy] to catch up in her profession and get a higher-paying position" despite her high degree of education. VRP at 361. Referencing Amy's difficulty in finding a job, the trial court then remarked that Amy's lengthy time out of the job market was detrimental to Amy's earning capacity because of changes in the teaching profession. The trial court stated,

> Being absent for such a long period, about [10] years, all sorts of things change in
> education, teaching. Technology changes; teaching methods change. And so the

---

[2] As set forth below, RCW 26.09.090 provides for a nonexclusive list of six factors for the trial court to consider for awarding spousal maintenance.

5

> [c]ourt is considering Ms. Atherton's testimony that it was a real detriment to her when she began applying for jobs, and there was, I think—there was evidence about the number of jobs that she applied for and it was substantial, the number, and she basically had to take what she could get which is her current position; and so she really does have some making up to do.

VRP at 361-62.

The trial court next addressed the parties' standard of living and duration of the marriage. The trial court found that the parties had a "high standard of living." VRP at 362. The trial court noted that Jason and Amy owned two homes in "a nice part of town," which had "good value," and it also noted that the family was able to go on vacations. VRP at 362. With respect to the duration of the marriage, the trial court found that their roughly 14 years of marriage was a "medium-length marriage." VRP at 362.

The trial court moved on to address Amy's age, physical and emotional condition, and financial obligations. The trial court found that Amy was young, appeared to be in good health, but she had "significant financial obligations, including paying her mortgage and providing for her four children." VRP at 363.

Finally, the trial court addressed the ability of Jason to meet his needs and financial obligations while meeting Amy's needs and financial obligations. The trial court first addressed Jason's ability to meet his needs. The trial court noted that

> Mr. Atherton is resourceful and intelligent, and he has the good fortune of having a good job that pays well; and he has—his income is significantly more than the petitioner's income.

VRP at 363. Based on this resourcefulness and intelligence together with the parties' income disparity, the trial court determined that Jason had the ability to pay spousal maintenance while still meeting his own needs and financial obligations.

6

Following its discussion of all these different considerations, the trial court ordered Jason to pay Amy $3,000 per month in spousal maintenance for five years (two more years than Amy had requested).

Immediately after the trial court issued its spousal maintenance award, the trial court switched back to the topic of Jason's income, returning again to its consideration of child support. The trial court observed that Jason's counsel had submitted a child support worksheet that showed that his gross monthly income was $13,476.67 per month and his net monthly income was $7,406. Neither Jason nor his counsel suggested that the income listed on the worksheet was incorrect or incomplete. The trial court adopted Jason's proposed income from the worksheet, finding that $13,476.67 for gross monthly income was a "fair figure." VRP at 364. The trial court also found that Amy's income was $4,250 per month based on the agreement of the parties.

Following the trial court's oral ruling, the hearing for presentation and final orders was set.

IV. PRESENTATION HEARING

At the presentation hearing, Jason orally moved for reconsideration with respect to the trial court's spousal maintenance award. Jason argued that the amount of spousal maintenance awarded to Amy was too high because he expected a decrease in his income and because of the impact of what he was ordered to pay in child support. Jason also argued that the duration of spousal maintenance awarded to Amy was too long because he had already paid temporary spousal maintenance of approximately $43,000.

The trial court denied Jason's oral motion for reconsideration. The trial court explained that it "thought a lot about" the spousal maintenance award and that the years Amy had been out of the workforce required the award. VRP at 400. The trial court explained,

> The spousal support is something that I thought a lot about. My main concern was that Ms. Atherton had been out of the workforce for about [10] years, and that's a long absence that sets a person back in many ways; and her testimony was when she applied for a job, she sent out a lot of applications. And she took—she really did not have bargaining power; she took the job that was offered to her, not that it wasn't a job that she would enjoy, but she really didn't have options because she's been out of the workforce for so long. There is a great disparity in their incomes, and the [c]ourt took that into account.

VRP at 400.

The trial court also explained that the amount and duration of its award was fashioned, in part, on the children's interests. The trial court stated that it wanted to increase the likelihood that Amy would be able to keep the home for the children's benefit. The trial court further explained that it felt its spousal maintenance award was reasonable because of the disparity between Jason and Amy's incomes and since Amy was "going to have bills to pay." VRP at 400. The trial court acknowledged that Jason felt that the duration of the award was too long, but reiterated that the award was in the children's best interests.

V. WRITTEN ORDERS AND APPEAL

Following the presentation hearing, the trial court entered final written orders consistent with its oral rulings, including that Jason was required to pay spousal maintenance in the amount of $3,000 per month for five years. The trial court's child support order stated that Jason's net monthly income was $7,406 and the attached child support worksheet stated that Jason's gross monthly income was $13,704.76.[3] From these amounts, the trial court ordered Jason to pay Amy $1,646.13 per month in child support.

---

[3] The child support worksheet in our record provides a slightly different figure for Jason's gross income ($13,704.76) from what the trial court orally found was Jason's gross income ($13,476.67).

The trial court did not expressly incorporate its oral ruling with respect to its lengthy consideration of the statutory factors for spousal maintenance into its final written orders.

Jason appeals.

## ANALYSIS

Jason challenges the trial court's spousal maintenance award by arguing that the trial court abused its discretion because it failed to give adequate consideration to several of the statutory factors relevant to spousal maintenance. We disagree.

### I. STANDARD OF REVIEW

The trial court exercises "broad discretionary powers in awarding [spousal] maintenance . . . ." *In re Marriage of Wilcox*, 3 Wn.3d 507, 517, 553 P.3d 614 (2024). The trial court's disposition will not be overturned on appeal absent a manifest abuse of discretion. *Id.* "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 563, 446 P.3d 635 (2019). A trial court's decision is manifestly unreasonable if it is "outside the range of acceptable choices, given the facts and the applicable legal standard . . . ." *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A trial court's decision is based on "untenable grounds" if the factual findings are unsupported by the record, and a decision is based on "untenable reasons" if it is based on "an incorrect standard or the facts do not meet the requirements of the correct standard." *Id.*

Where the trial court has weighed the evidence, the trial court's findings will not be disturbed on appeal so long as they are supported by substantial evidence. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007), *review denied*, 163 Wn.2d 1055 (2008).

" 'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.' " *Id.* (quoting *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)). We do " 'not substitute [our] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.' " *Id.* (quoting *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)).

II. SPOUSAL MAINTENANCE STATUTE

Spousal maintenance awards are governed by RCW 26.09.090. The statute includes a nonexclusive list of factors for the trial court to consider in awarding spousal maintenance:

> (1) In a proceeding for dissolution of marriage or domestic partnership . . . the court may grant a maintenance order for either spouse or either domestic partner. The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, *after considering all relevant factors including but not limited to*:
>
> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to [them], and [their] ability to meet [their] needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to [their] skill, interests, style of life, and other attendant circumstances;
>
> (c) The standard of living established during the marriage or domestic partnership;
>
> (d) The duration of the marriage or domestic partnership;
>
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
>
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet [their] needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090 (emphasis added).

The trial court must consider the factors listed in RCW 26.09.090, but it need not make specific factual findings on each factor. *Anthony*, 9 Wn. App. 2d at 564. Under the spousal

10

maintenance statute, " 'the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just.' " *Wilcox*, 3 Wn.3d at 520 (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984)). The purpose of spousal maintenance is to be " 'a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time.' " *Id.* (quoting *Washburn*, 101 Wn.2d at 179). The trial court's primary concern must be the parties' economic situations after dissolution. *Id.* at 520-21. But, in the end, it is an abuse of discretion to not give "fair consideration" to the statutory factors. *Anthony*, 9 Wn. App. 2d at 564.

RCW 26.09.090 does not expressly require written findings. In general, "when specific findings are not required by the statute[,] we review the record to determine whether the court engaged in the appropriate analysis." *In re Marriage of Morris*, 176 Wn. App. 893, 906-08, 309 P.3d 767 (2013) (rejecting the argument that the trial court's consideration of factors under RCW 26.09.090 require written findings). And when a trial court's "written findings of fact do not clearly reflect a consideration of the statutory factors, resort can be made to the court's oral ruling." *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981) (oral ruling considered in the context of statutory factors of child custody).

III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WITH RESPECT TO ITS SPOUSAL MAINTENANCE AWARD

Jason argues that the trial court abused its discretion in awarding $3,000 per month in spousal maintenance to Amy for five years because it did not give fair consideration to four (of the six) factors of RCW 26.09.090. Specifically, Jason contends the trial court was deficient in its consideration of the following factors: the first factor, RCW 26.09.090(1)(a) (the financial

resources of the party seeking maintenance); the second factor, RCW 26.09.090(1)(b) (the time necessary to acquire sufficient education or training for the party seeking maintenance); the fifth factor, RCW 26.09.090(1)(e) (the age, physical and emotional condition, and financial obligations of the party seeking maintenance); and the sixth factor, RCW 26.09.090(1)(f) (the ability of the party from whom maintenance is sought to meet their needs and financial obligations while meeting those of the party seeking maintenance).

## A.  AMY'S FINANCIAL RESOURCES

Jason first argues that the trial court abused its discretion because it is "impossible" to determine whether the trial court adequately considered the first factor, which is focused on the financial resources of the party seeking maintenance.  Br. of Appellant 20.  According to Jason, it is unclear that the trial court gave fair consideration to Amy's financial resources because the trial court did not assign values to bank accounts, cars, and other personal property in either its oral ruling or its written divorce order.  We disagree.

The trial court made two factual findings with respect to Amy's financial resources.  The trial court found that it was likely that Amy's income was lower than she could be making if she had remained in her profession instead of leaving the workforce to raise children in the home.  The trial court also found that Amy's resulting income was significantly lower than Jason's income.

Jason does not appear to challenge these findings.  Instead, he faults the trial court for not assigning values to certain assets, including the accounts, cars, and other personal property.  Jason is correct that the trial court did not assign specific values to these assets.  But while it may have been preferable if the trial court had attempted to assign dollar values to all of Amy's possible assets, the trial court did focus on Amy's principle source of income—her job earnings—and

12

generally considered the value of the remaining assets as a whole as it grouped them for allocation to each party.

Jason cites no authority for the proposition that a trial court is required to do more; that is, he cites no authority that suggests the trial court should have assessed in detail all potential assets with the presumption that they be liquidated to provide income resources beyond Amy's job earnings. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). It is possible, of course, that under other circumstances, a passive asset could be valuable enough such that the trial court would have to consider it as a resource relevant to potential income under this first statutory factor, but Jason makes no such argument about any particular asset here. Thus, we conclude Jason has failed to show an abuse of discretion with respect to this first factor of RCW 26.09.090.

B. TIME NECESSARY TO ACQUIRE SUFFICIENT EDUCATION OR TRAINING

Jason next argues that the trial court failed to give fair consideration to the second factor of RCW 26.09.090, which is focused on the time necessary to acquire sufficient education or training. Jason argues that the trial court's statement that "it will take time for [Amy] to catch up in her profession and get a higher-paying position" was unsupported by the evidence at trial. Br. of Appellant at 21. Jason contends that Amy never claimed that there were any changes to the teaching profession from when she was previously in the workforce or that she struggled to adapt to any such changes. Jason further argues that there was no testimony about Amy seeking better

13

employment, which undermines the trial court's concern about Amy being able to get a higher paying position in the future.[4] Jason's arguments are unpersuasive.

Jason is correct that Amy did not testify about changes in the teaching profession from when she was previously in the workforce. Jason is also correct that there was no testimony about Amy seeking better employment since she secured her private school teaching job. But Amy did testify that she stopped working after she became pregnant with her second child in 2012. And after about 10 years out of the workforce, Amy testified that she applied to at least 50 jobs before receiving her only offer of employment—a private school position that paid $51,000 per year.

Looking at Amy's testimony as a whole, substantial evidence supported the trial court's factual findings on this factor. A reasonable inference from Amy's testimony, especially her difficulty in finding a job in her profession while having excellent credentials, is that the time she took to raise the children meant her past teaching experience was outdated and that it would take time before she could secure a higher-paying position. As a result, the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the trial court's findings with respect to this statutory factor. *See Rockwell*, 141 Wn. App. at 242. Because substantial evidence supported the trial court's findings of fact with respect to this second factor of RCW 26.09.090, the trial court did not abuse its discretion.

---

[4] Although Jason couches his argument as the trial court's failure to give fair consideration to this factor, it appears that his argument is more appropriately characterized as whether substantial evidence supported the trial court's finding.

C. AMY'S AGE, PHYSICAL AND EMOTIONAL CONDITION, AND FINANCIAL OBLIGATIONS

Jason next argues that the trial court did not give fair consideration to the fifth factor listed in RCW 26.09.090 related to Amy's age, physical and emotional condition, and financial obligations. Jason argues that Amy "will have many years and opportunities to make the most of her stellar credentials." Br. of Appellant at 22. We disagree that the trial court erred in its consideration of this factor.

Amy testified about her considerable expenses with the mortgage, taxes, and insurance, as well as the expensive extracurricular activities for the four children. From this testimony, the trial court found that although Amy was young and appeared to be in good health, she had "significant financial obligations, including paying her mortgage and providing for her four children." VRP at 363. And even if Jason is correct that Amy has "many years and opportunities" ahead of her, the maintenance award already accommodates these "many years" of future productivity because Jason's maintenance obligation sunsets in five years. Not only does substantial evidence support the trial court's finding on this factor, but the record shows that it gave fair consideration to this factor. The trial court did not abuse its discretion.[5]

---

[5] In Jason's opening brief, he stated that "Amy may assert that she is owed more in maintenance because she has the four children to support, and she has them the majority of the time per the parenting plan." Br. of Appellant at 23. Although Jason observed that the purpose of spousal maintenance is not to support children, he did not expressly argue that the trial court improperly based its maintenance award on supporting the children. In his reply brief, however, Jason argues for the first time that the trial court improperly based its maintenance award on the best interests of the children.

We decline to consider Jason's argument first made in his reply brief. RAP 10.3(c); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (explaining that we need not address arguments first raised in a reply brief). Nevertheless, in our review of the record, we see no error with the trial court's reference to the interests of the children when it contemplated

D. JASON'S ABILITY TO MEET HIS NEEDS AND FINANCIAL OBLIGATIONS WHILE MEETING THOSE OF AMY'S

Finally, Jason argues that the trial court did not give fair consideration to the sixth factor of RCW 26.09.090, which is focused on Jason's ability to meet his needs and financial obligations while meeting those of Amy's.

Related to this factor, Amy testified that her salary was $51,000, while Jason testified that his salary was about $140,000, even though he only worked a few hours per day. The parties also testified about Jason's past experience in running his own business, Atherton Scale. From this evidence, the trial court reasoned that Jason was resourceful, intelligent, and had a high-paying job that paid significantly more than Amy's teaching job and, thus, that Jason had the ability to pay his expenses and the ability to pay Amy spousal maintenance.

Jason makes two main arguments related to this factor. First, Jason contends that in its sequence of consideration, the trial court improperly determined spousal maintenance *before* determining child support and when it did, it failed to identify his income prior to announcing the maintenance award. Second, Jason complains that the trial court erred in settling on a monthly net income calculation of $7,406 and concluding that Jason had sufficient resources to pay the amount of the maintenance award. We disagree.

---

a spousal maintenance award. Maintenance of a caregiving spouse is unquestionably interrelated with the interests of the minor children in the care of that spouse. We view the trial court's comments merely as a recognition of this close relationship, rather than as an impermissible assignment of a particular expense to spousal maintenance that would be more properly considered under an award of child support.

Jason's first argument is that the trial court improperly determined spousal maintenance *before* determining child support. Jason argues that the spousal maintenance statute requires the trial court to calculate the need for spousal maintenance only *after* it has determined the parties' child support obligations.

Jason relies on *In re Marriage of Wilson*, 165 Wn. App. 333, 342, 267 P.3d 485 (2011). In *Wilson*, this court remarked that the spousal maintenance statute "directs a trial court to calculate the need for spousal maintenance only *after* it has determined the parties' child support obligations." *Id.* The *Wilson* court arrived at this interpretation based on language from RCW 26.09.090(1)(a) regarding the financial resources of the party seeking maintenance.[6] *Id.* The *Wilson* court interpreted the statute's language "the extent to which a provision for support of a child living with the party includes a sum for that party" to require the trial court to calculate any need for spousal maintenance only after it has determined child support obligations. *Id.*

This aspect of *Wilson* is not universally accepted. For example, in *In re Marriage of Condie*, Division One disagreed with the *Wilson* court's conclusion that the trial court must determine child support before spousal maintenance. 15 Wn. App. 2d 449, 457, 475 P.3d 993 (2020). Division One explained that in practice neither the spousal maintenance statute nor the child support statute "precludes a trial court from simultaneously looking at various scenarios for

---

[6] Restated again, this factor provides that the trial court should consider,

> The financial resources of the party seeking maintenance, including separate or community property apportioned to [them], and [their] ability to meet [their] needs independently, *including the extent to which a provision for support of a child living with the party includes a sum for that party*[.]

RCW 26.09.090(1)(a) (emphasis added).

maintenance and child support" before arriving at a final decision. *Id.* The court observed that the trial court "is not beset with an endless loop of mechanical computations." *Id.* at 458.

Here, it is true that the trial court announced its decision on spousal maintenance before its decision on child support and it did not expressly identify Jason's income until it addressed child support. But a careful review of the record demonstrates that the trial court was considering child support and spousal maintenance concurrently. In the sequence of its oral ruling, the trial court first explained that it was not including Jason's bonuses and income from Atherton Scale into its calculations of Jason's income. Then the trial court switched to spousal maintenance and provided a detailed analysis of the statutory factors before issuing its spousal maintenance decision. And immediately following the trial court's spousal maintenance decision (seven lines later in the transcript), the trial court switched back and stated that it was adopting Jason's proposed figure for his gross monthly income for the purposes of child support.

We agree with *Condie* that the trial court is not tied to a rigid sequence for consideration of these issues and that it is not precluded from simultaneously considering spousal maintenance and child support. 15 Wn. App. 2d at 457-58. Here, as seen by the way the trial court alternated between aspects of Jason's income and the spousal maintenance statutory factors, the trial court was clearly considering the child support and spousal maintenance issues concurrently as it explained its detailed oral ruling. It strains reason to assume that the trial court did not have Jason's income figures determined until after its decision on the maintenance award. Finding error on the part of the trial court merely for announcing those income numbers seven lines after the maintenance award would essentially elevate mechanics over substance, contrary to the logic of

*Condie*. Under these circumstances, we are unpersuaded that the sequencing of the trial court's comments amounted to an abuse of the trial court's broad discretion.

Jason's second argument regarding the trial court's consideration of the sixth factor of RCW 26.09.090 is the trial court erred in adopting a net monthly income for Jason of $7,406 per month. Jason argues that the trial court's assessment of his income ignores the fact that a $2,000 per month mortgage payment for rental property was imposed on Jason. Amy responds that Jason's complaints about potential financial hardship resulting from the trial court's maintenance award are not supported by the evidence and ignore other financial resources, like income from the rental home Jason will receive. We see no error in the trial court's exercise of its discretion.

Jason's complaints about his financial difficulties resulting from the maintenance award run squarely into the trial court's broad authority to balance the financial capabilities and needs of both parties to arrive at an award that is " 'just.' " *See Wilcox*, 3 Wn.3d at 520 (quoting *Washburn*, 101 Wn.2d at 178). The trial court heard the evidence and (as evident from the length of its oral ruling) clearly considered the multifaceted aspects of the parties' current and future financial prospects, and it arrived at a facially reasonable maintenance award. While Jason invites us to closely scrutinize the trial court's math, we decline the invitation. Indeed, Amy's response that Jason's complaints suffer from a lack of detail (because, for example, rental income is excluded from his calculations) and a lack of support in the record, underscores exactly why an appellate court should tread carefully before disturbing the exercise of a trial court's considerable discretion in this context. Jason may feel the award is too high and other trial courts might have agreed, but after our review of the entire record, including the trial court's lengthy consideration of the statutory factors, we are unable to say this award is "outside the range of acceptable choices." *See*

*Littlefield*, 133 Wn.2d at 47. Thus, we conclude that the trial court gave fair consideration to this factor.

## CONCLUSION

A careful review of the record shows that the trial court gave fair consideration to the RCW 26.09.090 factors in determining its spousal maintenance order and substantial evidence supports its findings, especially given the trial court's "broad discretionary powers in awarding [spousal] maintenance . . . ." *See Wilcox*, 3 Wn.3d at 517. Thus, we hold that the trial court did not abuse its discretion when it awarded Amy $3,000 in spousal maintenance for five years.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

MAXA, J.