IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>TONI MARIE STEENDAHL,<br><br>                Respondent,<br><br>   and<br><br>MARCUS GEORGE STEENDAHL,<br><br>                Appellant. | No. 85727-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — After Marcus Steendahl failed to respond to Toni Young's[1] petition for dissolution, Young obtained an order on motion for default. Steendahl later appeared and moved to vacate the decree of dissolution and final divorce order. Trial was held after the superior court partially granted Steendahl's motion to vacate. Steendahl asserts the trial court abused its discretion when it awarded Young spousal maintenance and attorney fees. We disagree and affirm.

FACTS/PROCEDURAL HISTORY

Steendahl and Young were married in November 2018. Around that time, Young lived and worked as a medical assistant in Kirkland. When her lease was up, Steendahl

---

[1] Upon the dissolution of the parties' marriage, the petitioner's last name changed from Steendahl to Young. We refer to the parties by their current surnames.

wanted Young to move in with him in Lynnwood and asked her to not work. As Young described it at trial:

> since … [Steendahl] had never been married before, he said he wanted an old-fashioned wedding where the wife stays home, cooks and cleans. I'd have to have his dinner ready for him by 6:00, 6:30 at night, and that's what he wanted. And I did that for a little over a year, and I didn't want to do that anymore.

Steendahl denied at trial ever asking Young to not work. While still married, Young then got a job as a medical assistant in Everett and was still working for the same employer at the time of trial, though in a different secretarial position. Steendahl works as a journeyman technician with the International Brotherhood of Electrical Workers.

The couple took many trips to Las Vegas during the marriage to gamble, sometimes flying first class. Both Steendahl and Young participated in the gambling. Young sometimes paid for tickets and paid for "VIP" entertainment for Steendahl's birthday, and Steendahl paid for the parties' other expenses in Las Vegas, including gambling and food. Young split her gambling winnings with Steendahl. Steendahl testified to the parties receiving gambling income in amounts of $17,230 and $24,599.

In March 2022 Young petitioned for dissolution of the marriage. In May the superior court granted Young's motion for default due to Steendahl's failure to respond. In August Young filed for a domestic violence restraining order because Steendahl falsely told police that she and her children had guns and threatened to hit her. The order required Steendahl to leave the residence. The restraining order was ultimately dismissed based on no domestic violence occurring between the parties. After Steendahl moved out, he visited Young unexpectedly and uninvited, looking through the window to see if anybody was there. He did this three or four times and would

2

sometimes stay 10 hours and talk about the divorce.

On September 13 the court issued the final dissolution decree and its findings and conclusions about the marriage. Ten days later Steendahl, through counsel,[2] moved to vacate the dissolution decree. The court vacated the decree only as to the division of the parties' assets and liabilities, spousal maintenance, and attorney fees. Steendahl filed a response to Young's petition.

A one-day bench trial occurred in July 2023. The court heard testimony from Steendahl and Young. Young testified that Steendahl controlled bill payments and "controlled the money." "[S]ince he filed the taxes, everything went into his account." Steendahl did not share his paychecks with Young, deposit money into an account for her, or pay her for bills she paid for while the couple lived together. Young said her current gross monthly income is $6,496. Her 401(k) retirement account through her employment had $1,167.36 in it at the time of trial. Young has no other retirement funds, inheritance, real property, or assets.

Steendahl testified he withdrew money from his 401(k) account when the parties took trips to Las Vegas. Steendahl, in addition to his 401(k) account, testified to having three separate inheritance accounts. During the marriage Steendahl withdrew more than $80,000 from his inheritance and explained, when questioned about the withdrawals, that he paid for things throughout the marriage, including bills and trips. According to Steendahl, he bought a Sleep Number bed valued at almost $6,000, spent more than $5,400 on furniture, and bought Young a ring totaling $22,427.55. Steendahl provided one statement from his 401(k) account from 2020 that showed an amount of

---

[2] The record shows that Steendahl's trial counsel filed a notice of appearance on September 12, 2022.

$155,376.31.[3]

Steendahl declined to provide straightforward information in answers to some interrogatories, and also during cross examination, as demonstrated when he was asked about his living situation and expenses:

> Q. Where do you reside?
> A. Right now, since I was kicked out of my apartment, my townhouse, I've been living at my sister's for, like, a thousand dollars a month. Okay?
> Q. And do you have any proof that you're paying your sister a thousand dollars a month?
> A. I can get it.
> Q. Do you have canceled checks that you are ready to –
> A. I usually pay them in cash.
> Q. Your sister, does she own a house?
> A. Yes.
> Q. Do you know what her mortgage is?
> A. She don't have a mortgage.
> Q. So you just give her a thousand dollars a month as a contribution for your living expenses?
> A. Well, do you pay rent?
> Q. I'm asking the questions, sir.
> A. Well, I mean, it's a pretty stupid question because a person pays rent for living.
> Q. Sir, does that cover your food and part of the utilities or just –
> A. Yes, it does.
> Q. And the rental?
> A. I just pay her a flat thousand dollars for the rent every month.
> Q. And again, it's cash?
> A. Yes.
> Q. Where were you living last month?
> A. I just told you. At my sister's.
> Q. So in June, you were living at your sister's?
> A. Yes.
> Q. I'm handing you what has been marked Exhibit 5. Do you know what that is a copy of?
> A. Yes.
> Q. What is it a copy of?
> A. Well, not – I don't know. It's mistaken, because I was living

---

[3] The 2020 amount in Steendahl's 401(k) account was not testified to, but the court stated the $155,376.31 amount in its oral ruling, which Steendahl does not challenge. Young's counsel stated that Steendahl provided the 2020 account information as part of discovery. It appears the 2020 statement is in the record.

at my sister … I have two sisters. … Okay?

> Q.    What is that a copy of?
> A.    A response to interrogatories.
> MS. TRUA [Young's counsel]: Move to admit Exhibit 5.
> THE WITNESS [Steendahl]: Yes.
> MS. TRUA: Move to admit.
> THE COURT: That's to me.

….

> THE WITNESS: The only problem is that It's my –
> THE COURT: Sir, let's wait until after we address this.

Steendahl's testimony continued:

> Q.    Could I please direct you to Exhibit 5, Mr. Steendahl? These are your responses. Question 4, was, What is your present address, email, and telephone number? Your answers contained on Exhibit 5, you listed, Carl Gaul, correct? Is that what you listed, sir?
> A.    No. No.
> Q.    So this – these answers aren't what you – what you listed?
> A.    The way you're asking them, okay, then no. I didn't answer these. Yeah.
> ….
> A.    All these things are written. I didn't fill out anything like this. Somebody took and copied this page, you know, or whatever because I didn't put all this stuff down. Someone typed it up, you know. And again, I may have signed it, but I didn't put all this stuff down.
> ….
> Q.    … Question No. 5, I said how long – I asked how long you resided at said address. Your answer is, Does not apply. Is that correct?
> A.    You said "address." What address are you talking about?
> Q.    Sir, number – Exhibit 5, answer No. 5, says, Does not apply. Is that correct.
> A.    No. It's not correct. I've lived there for – I've lived –
> Q.    Sir, does your answer on the Interrogatories –
> A.    I just told you. No, it doesn't apply.
> Q.    Does your answer on the interrogatory say, Does not apply?
> A.    Yes. It says that.

Young requested temporary spousal maintenance of $2,100 per month for six months. Young also asked for $6,000 in attorney fees based on the prolonged nature of the case and Steendahl's intransigent behavior. In respect to attorney fees, Young

5

testified she had paid $4,000 and owed $5,000 for trial services.[4] Steendahl requested that "to achieve fairness" the court order that the parties walk away from the marriage as is without any asset division or maintenance award.

In considering an equal and just distribution of property between the parties, the court, in its oral ruling,[5] stated:

> The duration of the marriage does play into account in this instance, and then there's also the economic circumstances of each spouse or domestic partner at the time the division of property is to become effective. So the one factor that does play in favor of the respondent's position of basically the parties walking away is the duration of the marriage. It was only about three and a half years, or roughly 40 months, and that does play towards the position of the respondent.
>
> However, when you are considering the very limited extent of community property involved here and the fact that the respondent has a significant amount of separate property at his disposal, and also determine the economic circumstances of each, particularly based upon how the marriage actually took place, because I did believe the testimony of the petitioner with regards to the description of how the marriage or standard of living was during the marriage, in that she gave up her job and employment at that point in time in order to provide a benefit to the marriage by taking care of the respondent during that, which has now left her in the economic circumstance of having significantly less available to her than she would have had otherwise, if that had not been the circumstance.
>
> The only retort to that testimony was: Why would I do that? And quite frankly, the behavior of the respondent during his testimony as well as during the testimony of the opposing party and, frankly, throughout the entire trial and just his attitude in responding to questions and things like that did not lend to providing him with much credibility with regards to his testimony.
>
> And when you are responding to questions, even questions from your own counsel, and barely providing responses and seemingly thinking

---

[4] Separate from and in addition to spousal maintenance, Young requested at trial a financial contribution from Steendahl of $4,000 for moving expenses so she could move out of state, which the court denied.

[5] On appeal, Steendahl filed the July 19, 2023 verbatim report of proceedings in compliance with RAP 9.2(a), but not the transcript of the court's oral ruling on August 3, 2023. He instead filed the August 2023 transcript with a declaration contemporaneous with his opening brief. Because Young had an opportunity to review prior to filing her response brief, we exercise our discretion to consider the transcript as part of the record. See RAP 1.2(a), (c).

that every question is a trick question, you ultimately end up not providing a lot of evidence from your side, and that ends up hurting your position. And in the eyes of the Court, as far as credibility is concerned, when you don't even look at opposing counsel and you have your back turned to them when they are asking you questions and you basically provide total disdain for the entire process, that weighs against you, and it doesn't really lend a lot of credibility to the responses that you provide …. And so that is something that I took into account when looking at the evidence.

The court also stated as part of its spousal maintenance findings:

From reviewing the evidence and the testimony with an eye to those factors, it appears to this Court that the financial resources of the parties seeking maintenance, the petitioner, that she has limited financial resources at this point due to the fact that she had quit a job in the beginning of the marriage at respondent's request so that way she could care for him. And the only retort or argument against that with regards to testimony from the respondent was: Why would I do that? Which, based upon the behavior, tone, and attitude of the rest of your testimony, did not find that to be a credible response to the testimony.

The court ordered[6] Steendahl to pay temporary monthly spousal

maintenance, stating:

By looking at the totality of the factors with regards to maintenance under RCW 26.09.090, I do find that some maintenance award would be in favor of the petitioner. I am not willing to do $2,100 per month, though. I will provide that the respondent is required to pay maintenance to the petitioner of $1,400 per month, and that's for a period of 12 months.

The court also ordered Steendahl to pay $6,000 in attorney fees based on his

intransigence. As part of its reasoning for the attorney fees award, the court

emphasized Steendahl's pretrial conduct, finding:

In this case, the petition was filed by the petitioner on March 18th, 2022. Petitioner had counsel assisting her when she filed this, and there were crickets from the respondent. The respondent did not have counsel at that point in time. … And after several months of waiting for a response, despite the fact that you're required to respond within 20 days of receiving that petition, having that served upon you, which Respondent did testify that he received it that same day, and he did nothing. He filed no response. He did nothing.

---

[6] We discuss the trial court's additional relevant factual findings below.

Motion for default was filed on May 19th and obtained that same day. Notice of those would have gone to you, and even receiving those notices, knowing that Petitioner was going to try to seek default, you did nothing. You filed nothing. You didn't obtain an attorney at that point in time. You then went on for several months, because that was in May. It wasn't until September, four months later, that Petitioner's counsel finally went in in order to get the findings of fact and conclusions of law obtained at that point, which she could have done right away, but she gave more time with regards to that.

Then it was at that point, which actually probably spurred on, based on the testimony, more in August, the month before, when dealing with the protection order issue at that point that finally you got spurred on in order to hire counsel. … Counsel ended up filing his notice of appearance September 12th. … [Steendahl's counsel] was able to quickly get the default order vacated to the extent of the property division and proceed forward at that point in time. A response was actually filed by November 1st, and so things started moving at that point, but not very quickly.

The court observed that the parties engaged in mediation several months later, "sometime in May or June," and in the meantime, Steendahl was "not displaying very good behavior," including making false reports to law enforcement and showing up at Young's residence and refusing to leave. The court continued:

[T]he behavior that you displayed during the hearing, the trial, you were being difficult with opposing counsel. You couldn't answer a question straight, even from your own counsel; refusing to answer a question and having your back turned to opposing counsel and just making cross-examination difficult and testimony difficult. Ultimately, the trial ended up being dragged on far longer than it absolutely needed to. And it was relatively short, because there is not a whole heck of a lot of things to go over, and it still took all day long.

Just the behavior of the respondent during trial, the responses that were provided in discovery that were essentially nonresponses, for the most part, and then the significant amount of delay in pretty much everything. Much of the behavior is looking at it from before you even got counsel involved. That rides against you. The factors of foot-dragging, obstructing, the refusing to cooperate with opposing counsel, noncompliance with discovery requests, and just your other conduct just during the hearing, you made this entire proceeding much more difficult and much more costly than it necessarily needed to be, particularly given what we had to divide.

And so I do think that intransigence plays a factor in this ….

8

The trial court ordered that its oral ruling be incorporated into its written order.[7]

Steendahl appeals.

## DISCUSSION

Steendahl only identifies two assignments of errors: (1) that the trial court abused its discretion in awarding spousal maintenance to Young and (2) the trial court erred in finding Steendahl intransigent and assessing attorney fees. Steendahl does not specifically assign error to the trial court's additional related findings in his briefing. See RAP 10.3(a)(4); In re Marriage of Drlik, 121 Wn. App. 269, 275, 87 P.3d 1192 (2004). Nonetheless, where he sufficiently challenges a finding of fact in his argument and the trial court's finding is inherent to the basis for its maintenance order, we exercise our discretion to address it as discussed below. See RAP 1.2(a), (c); Fox v. Sackman, 22 Wn. App. 707, 709, 591 P.2d 855 (1979) ("Modern rules of procedure are intended to allow the court to reach the merits, as opposed to disposition on technical niceties.").

### Spousal Maintenance

In Washington, spousal maintenance awards are governed by RCW 26.09.090. The statute requires a trial court to consider a nonexclusive list of relevant factors, including:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to

---

[7] The court's written findings and conclusions state that "other findings shall be transcribed and filed at a later date and are to be incorporated herein."

his or her skill, interests, style of life, and other attendant circumstances;
     (c) The standard of living established during the marriage or domestic partnership;
     (d) The duration of the marriage or domestic partnership;
     (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
     (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1).

We review factual findings to which the appellant has assigned error for substantial evidence. Drlik, 121 Wn. App. at 275; In re Marriage of Anthony, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019). "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). In our review for substantial evidence, we review the record in the light most favorable to the prevailing party. In re Marriage of Kaplan, 4 Wn. App. 2d 466, 479, 421 P.3d 1046 (2018). Unchallenged factual findings are treated as verities on appeal. Drlik, 121 Wn. App. at 275. If the findings are adequately supported, we review the trial court's award of spousal maintenance under the highly deferential abuse of discretion standard. In re Marriage of Leaver, 20 Wn. App. 2d 228, 238, 499 P.3d 222 (2021). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Anthony, 9 Wn. App. 2d at 563.

In the context of a spousal maintenance award, the trial court abuses its discretion if it does not base its maintenance award on a fair consideration of the statutory factors. In re Matter of Crosetto, 82 Wn. App. 545, 558, 918 P.2d 954 (1996). The trial court otherwise has broad discretionary powers to award maintenance, and it

need not make specific factual findings on statutory factors. <u>Washburn v. Washburn</u>, 101 Wn.2d 168, 179, 677 P.2d 152 (1984); <u>Anthony</u>, 9 Wn. App. 2d at 564. The court simply needs to consider the statutory factors. <u>Anthony</u>, 9 Wn. App. 2d at 564. We will not superimpose our own judgment upon the trial court's determination, reweigh the evidence, or assess witness credibility. <u>Kaplan</u>, 4 Wn. App. 2d at 479.

Steendahl contends the record does not support the trial court's finding that Young has limited financial resources because at the time of trial Young was working full time earning nearly $80,000 and shared the cost of rent by living with her adult children. Indeed, at the time of trial, Young earned $6,496 in gross income per month, which multiplied by 12 months totals $77,952. And Young testified that she lived with her adult children and all contributed to rent. But Steendahl challenges the trial court's finding out of context. The court found that Young "has limited financial resources at this point due to the fact that she had quit a job in the beginning of the marriage at respondent's request so that way she could care for him." In other words, the court's finding related to the fact Young could have had more resources if she had not quit her job at the request of Steendahl. In fact, at the time of trial, Young's sole asset was a 401(k) retirement account through her employment, which only amounted to $1,167.36. It follows that had Young not quit working at Steendahl's request, she would have continued to earn income and accrued greater retirement savings. The court's finding is supported by substantial evidence.

Steendahl argues that because it was shown at trial that Young was financially self-sufficient and the purpose of spousal maintenance is to support the requesting spouse until he or she is able to support themselves, the court's maintenance award

11

constitutes an abuse of discretion and should be reversed.[8] We reject the premise of Steendahl's argument and hold that the trial court did not abuse its discretion in awarding spousal maintenance. See In re Marriage of Steadman, 63 Wn. App. 523, 526 n.1, 821 P.2d 59 (1991) ("The judgment of the trial court will not be reversed if it can be sustained on any theory supported by the record and the law.").

Steendahl relies on In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994), wherein the court held that "[t]he purpose of spousal maintenance is to support a spouse, typically the wife, until she is able to earn her own living or otherwise becomes self-supporting." However, as our state Supreme Court recently made clear, this need-based language no longer carries the day.

In In re Marriage of Wilcox, 3 Wn.3d 507, 518-19, 553 P.3d 614 (2024), the state Supreme Court provided a brief history of spousal maintenance in Washington. The court cited to the Kelso line of cases pre-dating the inception of RCW 26.09.090 in 1973, which shared the public policy premise that alimony is intended to be temporary until the requesting spouse becomes self-supporting. Id. (citing Kelso v. Kelso, 75 Wn.2d 24, 27, 448 P.2d 499 (1968)); see, e.g., Endres v. Endres, 62 Wn.2d 55, 56, 380 P.2d 873 (1963) ("The needs of … [one spouse] and the financial ability of the … [other spouse] to pay are the essential elements which govern the granting of an alimony award."). Irrespective of RCW 26.09.090's extinguishment of alimony, the Supreme Court observed that many subsequent cases nevertheless perpetuated the need-based language of the Kelso era, including the Luckey decision. Wilcox, 3 Wn.3d at 521; see

---

[8] Steendahl does not challenge the specific amount or duration of the maintenance award, nor does he challenge his ability to meet his own needs and financial obligations while being able to pay the court-awarded maintenance.

also, e.g., In re Marriage of Irwin, 64 Wn. App. 38, 55, 822 P.2d 690 (1979) (abrogated by Wilcox, 3 Wn.3d at 521-23); In re Marriage of Foley, 84 Wn. App. 839, 845-46, 930 P.2d 929 (1997) (abrogated by Wilcox, 3 Wn.3d at 521-23).

In its consideration of the husband's challenge to the trial court's maintenance order requiring him to pay $4,000 per month for 11 years, the Wilcox court rejected the husband's argument that "a trial court abuses its discretion when it awards spousal maintenance absent a finding of need." 3 Wn.3d at 521-22. The court held that while a court must consider a spouse's need along with the other factors under RCW 26.09.090, "establishing need is not a prerequisite to a maintenance award." Id. at 523-24. The Wilcox court discussed its holding in Washburn, 101 Wn.2d 168, wherein it held that "'[t]he contribution of the supporting spouse to the attainment of a professional degree by the student spouse is a factor to be considered in … awarding maintenance pursuant to RCW 26.09.090.'" Id. at 525 (quoting Washburn, 101 Wn.2d at 170).

In regard to the trial court's large and long-term maintenance amount, the Wilcox court held that, "like [in] Washburn, the trial court recognized that an unfairness occurred that called for a remedy." Id. at 525-26. Among other factors, the wife in Wilcox stayed home to raise the children and worked only part-time jobs for almost half of the 20-plus year marriage. Id. at 516, 526. The family's business, "the only significant income producing asset," which was meant to support the community but grew substantially after the parties separated, was awarded to the husband. Id. The court held that the trial court's "equalization payment" to the wife after a fair consideration of the statutory factors and the particular case circumstances did not constitute an abuse of discretion. Id. at 526.

The Wilcox court observed that, "[a]t its core," the Washburn decision "stands for the proposition that in situations where one spouse supports the other spouse's economic undertaking with the mutual expectation of future financial benefit to the community, but the marriage ends before that benefit can be realized, that circumstance should be considered when awarding maintenance." Id. at 525. "This is especially so where the assets of the parties are insufficient to permit fair compensation to be affected entirely through property division." Id.; see also Washburn, 101 Wn.2d at 178. The trial court's ability to award maintenance under RCW 26.09.090 is only restricted to the extent that the amount and duration, in consideration of all relevant factors, is just. Washburn, 101 Wn.2d at 178.

Thus, a spouse's "demonstrated capacity of self-support does not automatically preclude an award of maintenance." Id. "The duration of the marriage and the standard of living established during the marriage must also be considered, making it clear that maintenance is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." Id. at 179. A court may exercise its broad discretion to grant maintenance by looking outside of the factors of RCW 26.09.090(1) to consider a spouse's contribution to the marriage. Id. "Spousal maintenance awards are not governed by a fixed rule but necessarily depend on the facts and circumstances of each case." Wilcox, 3 Wn.3d at 524. No one factor holds more weight than another. Id. at 523. "[T]he [trial] court's paramount concern is instead the parties' 'economic condition[s]' postdissolution." Id. at 525 (emphasis added) (quoting Washburn, 101 Wn.2d at 181).

In the instant case, the trial court's incorporated oral findings show the court based the spousal maintenance award on its recognition of an unfairness in the parties' post-dissolution economic positions that warranted a remedy. See State v. Truong, 168 Wn. App. 529, 539 n.6, 277 P.3d 74 (2012) (stating that oral findings expressly incorporated into written findings and conclusions are binding); Schoonover v. Carpet World, Inc., 91 Wn.2d 173, 177-78, 588 P.2d 729 (1978) (stating that appellate court may look to court's oral decision where findings "are incomplete or indecisive … to eliminate speculation as to the premises upon which the trial court based its decision").

The trial court observed the limited extent of the parties' community property and the significant amount of Steendahl's separate property upon the parties' dissolution, which Steendahl does not challenge. The court found Young's testimony credible in regard to the standard of living during the marriage and that she forwent employment to provide a benefit to the marital community by taking care of Steendahl. In its consideration of Young's financial resources under RCW 26.09.090(1)(a), the court found that Young's stay-at-home role at the beginning of the marriage resulted in her having comparatively less financial resources, including income and retirement fund accrual, and she made such uncompensated marital contributions because Steendahl asked her to. Steendahl does not challenge the trial court's finding that, to his benefit, Young did not work for a year of the marriage at his request.

Akin to Washburn, the trial court also made findings as to the duration of the parties' "short-term" marriage, RCW 26.09.090(1)(d), and their standard of living, RCW 26.09.090(1)(c), in its temporary award of spousal maintenance based on the parties' disparate post-dissolution positions. See 101 Wn.2d at 179.

15

Steendahl contends "the evidence is thin," to support the trial court's finding that the parties enjoyed a high standard of living during the marriage. See RCW 26.09.090(1)(c). We disagree.

Substantial evidence supports the trial court's finding that Young and Steendahl enjoyed a high marital standard of living. The parties made leisure and luxury purchases during their marriage. Steendahl and Young went on several Las Vegas vacations over the course of their short-term marriage and engaged in a significant amount of gambling. Steendahl withdrew funds from his inheritance and retirement accounts to fund trips and high-cost marital purchases, including furniture and a $22,427.55 ring for Young. Young testified she paid for first class tickets and "VIP" entertainment for Steendahl's birthday trip, and Steendahl testified he paid for the couple's other expenses once they were in Las Vegas, including gambling and food. Steendahl argues that he and Young lived a "modest middle-class lifestyle." But we do not reweigh evidence or superimpose our own judgment upon the trial court's determination. Kaplan, 4 Wn. App. 2d at 479.

Steendahl, without citing the record, avers that the trial court erred in finding that he paid for "most things" during the marriage. See RAP 10.3(a)(6) (requiring an appellant's brief to provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record"). The trial court found that

> [Steendahl] did pay for most things. He indicated that he was using a lot of the separate funds coming out of that active assets account in order to help support the marriage and essentially provide gifts to the marital community. And the testimony from … [Young] was that the only reason that she was not working was because of the request from him that she not work so that way she could care for him. And he testified and

presented a fair amount of evidence, including knowing specifically what those different amounts came to and what he spent them on and that he was spending it on the marital community in order to maintain that standard of living.

He testified that regarding their taxes, and going through great detail about it, that he was the main breadwinner and that he would give her money for dental work or entertainment money and et cetera, that he provided her with expensive gifts throughout the marriage. And so that particular factor, as far as standard of living, that seems to indicate that there was a high standard of living that was created and maintained throughout the marriage.

Steendahl's assertion that Young and Steendahl shared living expenses and they both paid for vacations does not substantively controvert the court's findings. Unchallenged factual findings are treated as verities on appeal. Drlik, 121 Wn. App. at 275. We are not required to address arguments not supported by citation to the record or meaningful legal authority. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Steendahl also challenges the trial court's finding that Young is "going to have to go back out into the workforce at this point" because she was already working at the time of trial. While the trial court did make this statement, the court also said, because Steendahl requested Young "quit a job at the beginning of the marriage," it "resulted in less retirement funds for the petitioner to accrue, which also allowed for less income and ended up being a timeout from the workforce, which, as most people know, and I certainly take judicial notice of, that tends to hurt your prospects when you're going back into the workforce." It is not altogether clear if the trial court misspoke regarding Young's need to reenter the workforce at the time of trial. Nonetheless, the trial court did not base its award of spousal maintenance on a finding that Young needed training to reenter the workforce or support for a duration specifically to give her time to find

17

employment. Rather, in its ruling as to maintenance, the court reasoned at the beginning of the marriage Young quit her job at Steendahl's request, resulting in less accrued retirement funds, less income, and a timeout from the workforce. The court also found that Young not working to support Steendahl was a benefit to him.

Steendahl contends the trial court abused its discretion to the extent it relied on him being "financially controlling." He first argues that the record does not support this finding. In its oral ruling, the trial court specifically refers to Young's testimony that Steendahl was financially controlling. Young testified Steendahl controlled bill payments and the money during the parties' marriage. Substantial evidence supports the court's finding. Steendahl further argues that, even if he was controlling, the court should not have considered this as a factor relevant to its spousal maintenance determination.

Although the plain text of RCW 26.09.090 precludes a trial court from basing a maintenance award on a party's misconduct, a trial court may consider a party's negative behavior if relevant to the requesting party's economic circumstances. In re Marriage of Foran, 67 Wn. App. 242, 258-59, 259 n.19, 834 P.2d 1081 (1992). We must presume a trial court considered evidence for proper purposes. See id. at 259. Because Steendahl merely concludes the trial court's potential reliance on his financially controlling conduct constituted an abuse of discretion, he has not overcome the presumption that the court considered such evidence outside the context of Young's post-dissolution financial circumstances.

Though the trial court did not base its award of spousal maintenance on the need for Young to acquire sufficient education or training to find employment, Steendahl, nonetheless, also challenges the court's finding that he gave Young $10,000 to help her

complete a master's degree program to obtain better employment. Steendahl conflates the court's basis of determining that the $10,000 was a gift to Young[9] with the factors to be considered under RCW 26.09.090. Steendahl argues that he never testified that he gave Young money to further her education, and instead, gave her money in the hopes of settling their divorce without further litigation. In fact, the trial court found that Steendahl provided $10,000 to Young to allow her to go back to school and "to just end the divorce without attorneys." At trial both parties testified to Steendahl giving $10,000 to Young around the end of 2022. Steendahl testified the parties agreed he would pay Young up to $20,000 for tuition so she could get her master's degree and increase her income. Both parties testified Steendahl deposited the first $5,000 for Young so she would drop the divorce lawsuit. Young testified Steendahl made the second $5,000 deposit because he did not want her to continue using legal services and offered to pay for her to go to school. According to Steendahl, Young ultimately decided she did not want use the money to go back to school because she felt Steendahl "was too controlling." Steendahl testified he tried to demand status updates on Young's education to protect his interest. Substantial evidence supports the court's finding.

Steendahl has not met his burden to establish that the trial court abused its discretion in its award of spousal maintenance.

---

[9] In its property division order, the trial court determined the $10,000 was a gift to Young and "will not offset any other financial issue with regards to the rest of the decision." Steendahl does not challenge the trial court's property distribution.

Attorney Fees

Steendahl contends that the trial court's attorney fees order based on his intransigence is not supported by substantial evidence. We disagree.

In a dissolution proceeding, the principal considerations for an attorney fees award are need, ability to pay, and equity. In re Marriage of Van Camp, 82 Wn. App. 339, 342, 918 P.2d 509 (1996). In addition to awarding attorney fees under RCW 26.09.140,[10] a party's intransigence provides an equitable basis for which a trial court may award attorney fees. In re Marriage of Chandola, 180 Wn.2d 632, 656, 327 P.3d 644 (2014). "Determining intransigence is necessarily factual, but may involve foot-dragging, obstructing, filing unnecessary or frivolous motions, refusing to cooperate with the opposing party, noncompliance with discovery requests, and any other conduct that makes the proceeding unduly difficult or costly." Wixom v. Wixom, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). An award of fees based on a party's intransigence requires a showing that the behavior caused the spouse seeking the award "to require additional legal services." Crosetto, 82 Wn. App. at 563.

A trial court's award based on intransigence is reviewed for abuse of discretion.

---

[10] Under RCW 26.09.140:
>    The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.
>    Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs.
>    The court may order that the attorneys' fees be paid directly to the attorney who may enforce the order in his or her name.

Wixom, 190 Wn. App. at 725. We review the record to decide whether substantial evidence supports the trial court's factual findings and, if so, whether such findings support the conclusions of law and the judgment. Id. at 724.

In opening, Young's counsel requested $6,000 in attorney fees based on prolonged litigation. The trial court awarded attorney fees to Young based on Steendahl's conduct pretrial as well as his behavior during the one-day hearing that made the process more difficult and costlier than necessary, particularly given his lack of response to the petition for dissolution that led to an initial default that was later partially vacated.

Despite challenging many of the trial court's factual findings regarding his intransigent behavior, Steendahl concedes in his briefing that he failed to respond to Young's divorce petition leading to an initial default judgment and subsequent partial vacation order, which prolonged litigation. Steendahl also does not challenge the trial court's chronological findings, which show that he failed to respond to the proceedings for nearly six months. This supports the court's finding that, despite a requirement to respond within 20 days, Steendahl filed no response and did nothing during this time.

The record supports the trial court's finding that before the parties attempted mediation in the months prior to trial, Steendahl did "not display[] very good behavior." The court found false reports were made to law enforcement and Steendahl showed up at Young's home and would not leave. At trial Young testified that Steendahl called police and falsely told them lies about Young and her adult children. Young also testified that after Steendahl moved out he would show up at her house unexpected and uninvited, looking through the window to see if anybody was there.

During trial, there is substantial evidence of Steendahl's defiant or nonresponsive behavior, which required opposing counsel, the court, and his own counsel to redirect him throughout the hearing. The record shows that Steendahl provided nonresponsive answers to interrogatories, and that he maintained evasiveness to related questioning during trial. Indeed, Steendahl's own counsel acknowledged at closing that keeping Steendahl "on task to the questions asked and the relevant topics was … not easy to accomplish."

The court also observed Steendahl keeping his back turned to opposing counsel during questioning, which made cross-examination difficult, and that Steendahl showed "total disdain for the entire process." The court stated Steendahl's behavior at trial contributed to turning an otherwise short hearing into an arduous proceeding that "still took all day long." Because we necessarily defer to a trial court's observation of a witness's demeanor, we reject Steendahl's contention that the trial court did not address his physical behavior on the record. See In re Dependency of J.D.P., 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021); In re Marriage of Rideout, 150 Wn.2d 337, 351-52, 77 P.3d 1174 (2003). The record supports the trial court's finding that Steendahl's intransigent behavior unnecessarily prolonged litigation.

Lastly, Steendahl, for the first time on appeal, avers that the trial court improperly failed to provide a factual basis for the $6,000 attorney fee award to Young. Young testified she had paid her attorney $4,000 in attorney fees and owed her attorney $5,000 for a total of $9,000 in fees. Young explained to the court she was only asking for $6,000 in an effort "to be reasonable." Steendahl claims that Young did not file a fee declaration on appeal, yet he did not object to the amount of the attorney fee award

before the trial court. We do not consider arguments made for the first time on appeal. RAP 2.5(a); <u>Clapp v. Olympic View Publ'g Co.</u>, 137 Wn. App. 470, 476, 154 P.3d 230 (2007).

We affirm.

_____  Coburn, J.

WE CONCUR:

_____  _____
Díaz, J.                    Smith, C.J.