IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Matter of the Marriage of | No. 87994-4-I |
| CHRISTINA BANDARAGODA, n/k/a NORTON, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| SANJAYA BANDARAGODA, | |
| Appellant. | |

SMITH, J. — Sanjaya Bandaragoda appeals the final parenting plan, final child support order, spousal maintenance award, domestic violence protection order (DVPO), and attorney fee award entered following the dissolution trial of his marriage to Christine Norton. We conclude that the trial court erred by failing to include Bandaragoda's maintenance payments in calculating the parties' net monthly incomes, which in turn affected his monthly child support payments and the parties' proportional share of child-related expenses. We remand to correct this error, and otherwise affirm.

FACTS

Bandaragoda and Norton married in May 2001 and had three children: K.B., A.B. and S.B. Bandaragoda worked as a software engineer at Microsoft. Norton worked as a senior research scientist at the University of Washington until she was laid off in March 2021.

The parties separated on Thanksgiving Day 2020 after Bandaragoda physically assaulted Norton and A.B., resulting in Norton suffering a concussion. Bandaragoda was charged with assault in the fourth degree with a domestic violence designation and ordered to comply with treatment under a pretrial diversion agreement. Norton requested and was granted a no-contact order and a one-year DVPO, which was renewed in 2022 and again in 2023 and 2024.

In January 2021, Norton petitioned for dissolution. The initial temporary parenting plan entered in March 2021 provided differing residential schedules for each child. S.B., age 17, had alternating residential weeks with each parent. K.B., age 12, was to reside with Norton and have supervised visits with Bandaragoda. A.B., age 14, was to reside with Norton and engage in reunification therapy with Bandaragoda. The court subsequently entered several temporary parenting plans with adjusted residential schedules.

In March 2021, the court appointed David Hodges as guardian ad litem (GAL) to investigate and file a report concerning "[a]ll issues related to making a parenting plan for these children" and "[d]omestic violence of [Bandaragoda]." The GAL filed an initial report in August 2021 and an update report in December 2022 recommending parenting and decision-making limitations based on Bandaragoda's child abuse and domestic violence. The GAL's report referenced information provided by Dr. Erin McKee, a psychologist and former close friend of Norton's who acted as a personal reference for Bandaragoda. According to the report, McKee acknowledged that she had not conducted a psychological evaluation of Norton but nevertheless opined that Norton exhibited "symptoms of

2

Cluster B personality disorder traits, including histrionic behavior, being emotionally labile, and manipulativeness."

In February 2022, the court entered an agreed order appointing a parenting coordinator to "help[ ] the parents manage their parenting plan, facilitate communication, and resolve disputes in implementing the parenting plan." In March 2023, Lisa Kibbee began serving as parenting coordinator. In September 2023, Kibbee also began supervising visits between A.B. and Bandaragoda and participating in their reunification process. Despite this professional assistance, the dissolution proceedings remained highly litigious and contentious.

In September 2023, Norton suffered a mental health breakdown and was involuntarily committed. She was released about a week later. Around the same time, Kibbee forwarded to Bandaragoda an e-mail in which Norton wrote: "IF I SEE SANJAYA I WILL FUCKING KILL HIM." Bandaragoda petitioned for and was granted a one-year DVPO against Norton. On November 1, 2023, the trial court entered a new temporary parenting plan granting Bandaragoda sole custody and decision-making authority and requiring Norton to engage in an evaluation with clinical psychologist Dr. Sierra Swing. In an updated report, the GAL recommended that this custody arrangement be continued. Kibbee supervised Norton's visits with the children.

A five-day bench trial commenced on January 13, 2025. Fifteen-year-old K.B. was the parties' only minor child by then. Norton asked that primary custody of K.B. be returned to her or at least be shared. She requested $5500 per month

in spousal support for eight years, arguing that her prospect for future earnings is significantly less than Bandaragoda's. She also sought an award of attorney fees in the amount of $115,952.00 based on need versus ability to pay and Bandaragoda's intransigence. Bandaragoda proposed that K.B. reside with him and have visitation with Norton. He also asserted that he should not have to pay maintenance and that Norton should pay all or some of his attorney fees.

The court heard expert testimony from Dr. Swing and the GAL, as well as testimony from Kibbee, Bandaragoda, Norton, and several lay witnesses for Norton. The court also reviewed 54 exhibits, including the reports of Dr. Swing and the GAL in their entirety.

The GAL testified that Bandaragoda responded well to domestic violence treatment and now has a good relationship with the children. He recommended that K.B. reside primarily with Bandaragoda, noting that this was K.B.'s expressed preference. He also recommended imposing parenting restrictions on Norton based on her history of mental health illness and her abusive use of conflict.

Dr. Swing testified about her psychological evaluation of Norton. Her diagnostic impression was that Norton had "[o]ther specified personality disorder" with histrionic, turbulent, borderline and narcissistic features. Dr. Swing noted that she had interviewed Dr. McKee, who characterized Norton's behavior as "manipulative and damaging." Dr. Swing also noted that Dr. McKee "didn't completely accept the idea that [Norton] was the victim and that [Bandaragoda] was the perpetrator."

4

Kibbee testified that her role as parent coordinator was to "assist the parties in parallel parenting" and "getting [the reunification] process started." She later began supervising visits at the GAL's request. Kibbee acknowledged that she is not a reunification therapist. But she agreed that she was "kind of doing all three" roles by that point.

Norton's testimony focused on the impact of Bandaragoda's domestic violence on the family. She also expressed doubt that Kibbee could remain unbiased given her conflicting roles. Bandaragoda highlighted Norton's mental health issues and averred that he had changed after going through domestic violence treatment.

At the close of trial, the court issued an extensive oral ruling. The court began by explaining how it weighed the testimony of Kibbee, the GAL, and Dr. Swing. The court found that Kibbee "seemed to take on multiple roles that appear . . . [to be] in conflict with each other, or she was not qualified to take on." In its oral ruling, the court specified:

> [Kibbee's] first role was to be the supervisor for supervised visitation with the parents. However, she took no notes, and inappropriately interjected herself into the visits themselves and with the children beyond what her goal should have been and showing a lack of objectivity. The role was to be the supervisor for the supervised visitations, not to be their counselor, nor to be the guardian ad litem in this particular instance.
>
> She then took on the role of parent coordinator where she began passing financial between the parties in violation of dual no-contact orders, passed attorney-client privilege information of [Norton] onto [Bandaragoda], and again, in violation of the no-contact orders. She testified that she had domestic violence training, but never utilized it in her goals that she took on during the course of this case as well. Finally [Kibbee] apparently also took on the role of family reconciliation therapist for this family, despite not being a

5

licensed mental health therapist or having any such training or experience.

The court further found that Kibbee's decision to forward Norton's threatening e-mail to Bandaragoda demonstrated that she lost objectivity, particularly given Kibbee's testimony that she did not believe it was a true threat. So the court "disregard[ed] any testimony or information provided by Ms. Kibbee."

The trial court also expressed disapproval of the GAL and Dr. Swing for relying "heavily" on Dr. McKee in reaching their "conclusions on information and diagnostic impressions." The court noted that Dr. McKee "provide[d] her diagnostic impressions despite having never evaluated [Norton]," which it found "highly unethical on McKee's part and in violation of the Goldwater Rule of the APA [American Psychiatric Association]." The court therefore "disregard[ed] any testimony or information provided by McKee" and weighed the opinions of Dr. Swing and the GAL accordingly. The court further faulted the GAL for "rel[ying] on the idea that the child should choose for themselves the custodial arrangement," stating that "[t]his viewpoint is wholly inappropriate and in direct conflict with the directive to our guardian ad litem to guide their investigation."

The court rejected Bandaragoda's request for parental limitations against Norton, finding that her e-mail was not a "true threat" and the resulting DVPO was "overblown." As to Norton's mental health breakdown, the court noted that "the marriage ended in a fiery incident caused by [Bandaragoda]" and that Norton "then spent three years during the global pandemic caring for the needs of three teenage children, each with their own emotional baggage that they were dealing with while still trying to deal with their own." The court also discounted

6

Dr. Swing's diagnostic impressions of Norton because her "conclusions are tainted by information from Ms. Kibbee and the unethical practices of McKee" and "fail[ed] to take into greater consideration the input from [Norton's] long-term therapist" and Norton's ADHD.

The court then found "a history of domestic violence in the home" perpetuated by Bandaragoda, including physical, verbal and emotional abuse as well as a history of financial control throughout the marriage. The court expressed doubt that Bandaragoda had actually changed, finding that he used Dr. McKee "to drive a wedge" between Norton and the children and that he engaged in "a campaign to rewrite the narrative of his own domestic violence and a continuation of the DV [domestic violence] cycle." The court also pointed to "unrefuted testimony" that the children have suffered through multiple hospitalizations and that K.B.'s "schooling appears to be suffering" under Bandaragoda's care. Accordingly, the court found that it is in K.B.'s best interest to return to Norton's custody and have alternating weekends with Bandaragoda.

Next, the court entered oral rulings as to financial matters.[1] The court ordered Bandaragoda to pay Norton $1,110 in monthly child support, based on his net monthly income being $12,611 and her net monthly income being $3,657. It contemporaneously ordered Bandaragoda to pay Norton spousal maintenance in the amount of $4,000 per month for three years, followed by $3,000 per month for two years, followed by $2,000 per month for one year. The court also granted

---

[1] The trial court also entered extensive findings and conclusions on division of property, which Bandaragoda does not challenge.

Norton attorney fees in the amount of $115,000 based on Norton's need and Bandaragoda's ability to pay and the doctrine of intransigence.

On March 10, 2025, the court issued final orders, including written findings and conclusions consistent with its oral ruling, a final divorce order, parenting plan, final child support order and worksheets. After hearing argument from the parties, the trial court declined to renew the original one-year DVPO and instead imposed a five-year DVPO protecting Norton and K.B under the cause number for the dissolution.

Bandaragoda appeals.

ANALYSIS

Child Support Allocation

Bandaragoda contends that the trial court erred in failing to include contemporaneously ordered maintenance when calculating the parties' income for purposes of calculating child support under the child support schedule. We agree.

We review child support decisions for abuse of discretion. *In re Marriage of Fiorito*, 112 Wn. App. 657, 663, 50 P.3d 298 (2002). A trial court necessarily abuses its discretion if its decision is based on an erroneous view of the law. *In re Marriage of Choate*, 143 Wn. App. 235, 240, 177 P.3d 175 (2008).

"The child support statutes are expressly intended to divide the child support obligation between parents in proportion to their income." *In re Marriage of Condie*, 15 Wn. App. 2d 449, 456, 475 P.3d 993 (2020). When determining income for purposes of child support, the court must consider all sources of

8

income except those excluded in RCW 26.19.071(4). Under RCW 26.19.071(3)(q), the obligee's income includes "maintenance actually received." By extension, the obligor parent's "court-ordered maintenance" shall be "deducted from gross monthly income to calculate net monthly income." RCW 26.19.071(5)(f). "A trial court's failure to include all sources of income not excluded by statute is reversible error." *In re Marriage of Bucklin*, 70 Wn. App. 837, 840, 855 P.2d 1197 (1993).

Here, the trial court did not include the maintenance it contemporaneously ordered Bandaragoda to pay Norton when computing child support on the child support schedule:

> [RCW] 26.09.090(1)(a) requires that the child support is taken into account first. And once child support is determined, then the decisions are made with regards to maintenance and with property division. . . . That is the order of decision making and that's what's being done in this particular instance."

In doing so, the court followed *In re Marriage of Wilson*, 165 Wn. App. 333, 267 P.3d 485 (2011). In *Wilson*, Division Two concluded that a conflict exists between the child support statute and the maintenance statute. 165 Wn. App. at 343.

Resolving this conflict, Division Two concluded that RCW 26.09.090(1)(a) "directs a trial court to calculate the need for spousal maintenance only *after* it has determined the parties' child support obligations." 165 Wn. App. at 342. Accordingly, *Wilson* held that "the trial court did not abuse its discretion in not including the maintenance in the child support worksheets." 165 Wn. App. at 343. But in *Condie*, this court expressly disagreed with *Wilson* and held that

9

"[c]ontemporaneously awarded maintenance must be considered when determining the income and net income of parents for purposes of calculating child support under the child support schedule." 15 Wn. App. 2d at 458.

Because the trial court here followed *Wilson* rather than *Condie*, it did not consider Bandaragoda's court-ordered maintenance obligation in calculating his net monthly income or Norton's gross income and deducting maintenance from Bandaragoda's gross income. This error affected the proportional amount of child support he pays every month. We therefore remand for the trial court to recalculate Bandaragoda's child support obligation under *Condie*. In doing so, the court may reconsider its maintenance award.

Maintenance Award

Bandaragoda next challenges the trial court's six-year maintenance award to Norton. "The trial court exercises broad discretionary powers in awarding maintenance, and its disposition will not be overturned on appeal absent a showing of manifest abuse of discretion." *In re Marriage of Wilcox*, 3 Wn.3d 507, 517, 553 P.3d 614 (2024).

In Washington, spousal maintenance is governed by RCW 26.09.090. "An award of maintenance is meant to be 'a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time.' " *Wilcox*, 3 Wn.3d at 520 (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984)). The trial court must consider all relevant factors, including but not limited to:

(a) The financial resources of the party seeking

maintenance, including separate or community property apportioned to [them], and [their] ability to meet [their] needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to [their] skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet [their] needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1).

Bandaragoda argues that reversal is warranted because the trial court failed to give fair consideration to at least three of the six factors, and only fleeting mention of two more. Specifically, he asserts that the court failed to mention or discuss resources available to Norton and how that should affect maintenance; Norton's background, education, or time needed to receive training; Norton's health, age, or physical and emotional condition; Norton's financial obligations; or Bandaragoda's ability to meet his needs and financial obligations.

Failure to give the statutory factors fair consideration may constitute an abuse of discretion. *In re Marriage of Crosetto*, 82 Wash. App. 545, 558, 918 P.2d 954 (1996). But "[n]othing in RCW 26.09.090 requires the trial court to make specific factual findings on each of the factors listed in RCW 26.09.090(1).

11

The statute merely requires the court to consider the listed factors." *In re Marriage of Mansour*, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). "Findings of fact and conclusions of law should be sufficient to suggest the factual basis for the ultimate conclusions." *In re Marriage of Monaghan*, 78 Wn. App. 918, 925, 899 P.2d 841 (1995).

Here, the trial court's oral findings, written findings, and maintenance award reflect consideration of the relevant statutory factors. The court expressly considered the 20-year duration of the marriage. The court also considered "the standard of living that was established during the marriage . . . as testified to by both parties, including trips and the ability to purchase second homes." The court also recognized the financial resources of both parties by finding that "given the economic circumstances of each wherein [Norton] has a financial need and [Bandarogoda] has an ability to pay to equalize the circumstances, it does appear appropriate to equalize the circumstances for a period of time, particularly since [Bandarogoda] will not be paying for two mortgages going forward." The court further referenced Norton's ability to meet her needs by noting that "a spouse's prior or current demonstrated capacity of self support does not automatically preclude an award of maintenance." And in its written findings, the court further referenced the parties' ability to meet their needs, as reflected in its finding that it considered "need balanced with ability to pay, the duration of the marriage and the ability for [Norton] to work, balanced with [Bandarogoda]'s employment income." And the court expressly considered the impact of Bandaragoda's child support obligation. Further, the court entered extensive

written and oral findings regarding the parties' net monthly income, financial obligations, and financial resources. Bandaragoda has failed to show that the trial court failed to consider the relevant statutory factors.

Bandaragoda also argues that the trial court erred by stating in its oral ruling that "[m]aintenance is an issue of financial need versus the ability to pay," a notion he asserts was disavowed in *Wilcox*, 3 Wn.3d 507. In *Wilcox*, our Supreme Court held that "while a requesting spouse's need must be considered among the other statutory factors before awarding maintenance, it is not a prerequisite to a maintenance award." 3 Wn.3d at 524. The trial court's brief statement does not run afoul of *Wilcox*.

Bandaragoda also asserts that the trial court abused its discretion in awarding maintenance for a duration of six years. We disagree. "The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just." *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). "[T]he court's paramount concern must be the parties' economic conditions postdissolution." *Wilcox*, 3 Wn.3d at 520-21.

Here, the evidence established a significant discrepancy between Norton and Bandaragoda's incomes and financial situations during a 20-year marriage. And the court rejected Norton's request for eight years of maintenance at $5,500 per month in favor of a declining schedule of child support consisting of $4000 per month for three years, $3000 per month for two years, and $2000 per month for one year. The award was not unreasonable or unjust given the parties'

13

circumstances as documented extensively at trial. *See Wilcox*, 3 Wn.3d at 526 (affirming 11 years of maintenance after 21-year marriage).

Bandaragoda also argues that the final divorce order contains an internal inconsistency that requires correction. In the spousal support section, the order states as follows:

> Whether or not there is an end date; as a matter of law, spousal support will end when either spouse dies, or the spouse receiving support gets married or registers a new domestic partnership, *unless expressly stated below*. (RCW 26.09.170(2)).
>
> Other:
>
> Spousal support will be paid for a period of 6 years. [Bandaragoda]'s obligation does not terminate and due to the protection order, [Bandaragoda] has no right to know if [Norton] co-habits or remarries.

(Emphasis added.)

Bandaragoda asserts that no legal basis exists for ordering that he "has no right to know" if Norton remarries, especially where maintenance terminates upon remarriage. He further asserts that the DVPO already carves out exceptions for communication on parenting matters, so no compelling reason exists to prohibit a one-time notification of remarriage. But the order expressly states that Bandaragoda's six-year maintenance obligation "does not terminate," so no inconsistency exists. RCW 26.09.170(2). And "[a]lthough RCW 26.09.170(2) establishes a presumption that maintenance will terminate upon remarriage, it does not require that result." *In re Marriage of Tower*, 55 Wn. App. 697, 704 n.4, 780 P.2d 863 (1989). The order does not contain an inconsistency.

<u>Parenting Plan - Expert Opinions</u>

Bandaragoda claims that in rendering a parenting plan that returned custody of K.B. to Norton, the trial court improperly dismissed or downplayed the expert opinions of Dr. Swing, the GAL, and Kibbee.  We disagree.

We review a trial court's ruling on provisions of a parenting plan for abuse of discretion.  *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).  Where, as here, the trial court has weighed the evidence, we defer to the trial court's determinations concerning the persuasiveness of the evidence, witness credibility, and conflicting testimony.  *Knight v. Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).  Unchallenged findings of fact are verities on appeal. *In re Marriage of Laidlaw*, 2 Wn. App. 2d 381, 386, 409 P.3d 1184 (2018).

First, Bandaragoda argues that the trial court erred in faulting the GAL for "rel[ying] heavily on the child choosing the custodial arrangement for himself," finding such reliance "wholly inappropriate and in direct conflict with the directive of a court appointed guardian ad litem to guide their investigation."  He points out that the GAL was required to report K.B.'s expressed preferences regarding the parenting plan under RCW 26.12.175(1)(b) and the order appointing him. Bandaragoda therefore contends that the trial court's erroneous misunderstanding of the GAL's duty tainted its credibility determination.

But after making the challenged statements, the court further stated that it "is required to consider what is in the best interest of the child, not whatever they decide.  To that end, the Court reviewed in detail the information obtained by the

[GAL] from the parties, children's therapists, CPS workers, DV assessments and assessors, and compared it with the testimony of the parties."

RCW 26.09.187(3) states that a "child's residential schedule shall be consistent with RCW 26.09.191" and that the seven factors listed in RCW 26.09.187(3)(a)(i)-(vii) are considered if "the limitations of RCW 26.09.191 . . . are not dispositive of the child's residential schedule."

RCW 26.09.191(4)(a)(iii) requires a trial court to limit a parent's residential time if it finds that the parent has "[a] history of acts of domestic violence as defined in RCW 7.105.010." The trial court appropriately rejected the GAL's testimony that K.B.'s wishes should control where Bandaragoda repeatedly committed domestic violence.

Next, Bandaragoda contends that the trial court unduly overemphasized Dr. McKee's statements in weighing the testimony and opinions of Dr. Swing and the GAL. He asserts that the court erred finding that it was "highly unethical" for Dr. McKee to provide her diagnostic impressions of Norton despite having never evaluated her "in violation of the Goldwater Rule of the APA."

Under the Goldwater Rule, it is unethical for any psychiatrist to discuss any diagnosis of a public official "unless he or she has conducted an examination and has been granted proper authorization for such a statement." Maria A. Oquendo, *The Goldwater Rule: Why Breaking it is Unethical and Irresponsible*, AM. PSYCHIATRIC ASS'N (Aug. 3, 2016), https://www.psychiatry.org/news-room/ apa-blogs/apablog/2016/08/the-goldwater-rule [https://perma.cc/Z5PK-LD4T]. Dr. McKee is not a public figure, so we agree that the Goldwater Rule does not

16

apply to her. Even still, the evidence supported the trial judge in finding it was inappropriate for Dr. McKee to provide her psychiatric opinion to the GAL and Dr. Swing at Bandaragoda's request without conducting an evaluation, and that this justified placing less weight or no weight on testimony premised on Dr. McKee's opinion. Bandaragoda attempts to minimize the problem by claiming that Dr. McKee was acting only as a friend, but this does not purge the taint.

Bandaragoda also claims that Dr. McKee's speculations were only a "tiny fraction" of the GAL's report, so the court's concerns were "much ado about nothing." He asks us to reexamine the evidence and reach a different conclusion. But "[t]his court does not substitute its judgment for that of the trial court or reweigh the evidence or the credibility of the witnesses." *In re Marriage of Weaver*, 20 Wn. App. 2d 388, 413, 505 P.3d 560 (2021).

Next, Bandaragoda argues that the court erred in disregarding Kibbee's testimony because she "seemed to take on multiple roles that appear . . . to be in conflict with each other, or she was not qualified to take on." He points out that Kibbee's roles as parenting coordinator and visitation supervisor were court-ordered and/or agreed by the parties. He also disputes the court's finding that Kibbee took on a third role as a "family reconciliation therapist" given Kibbee's express testimony that she "had training as a reunification provider" but "w[as]n't a reunification therapist." But Kibbee acknowledged that she became involved in the reunification process via her other roles and that she was "kind of doing all three at that point."

The court found other concerns with Kibbee.  It found that she "took no notes, and inappropriately interjected herself into the visits themselves and with the children beyond what her goal should have been and showing a lack of objectivity.  The role was to be the supervisor for the supervised visitations, not to be their counselor, nor to be the [GAL]."  The court also found that Kibbee "began passing financial [information] between the parties in violation of dual no-contact orders, passed attorney-client privilege information of [Norton] onto [Bandaragoda], and again, in violation of the no-contact orders."  Bandaragoda asserts that attorney-client privilege was waived.  But even if it was, the court expressly found that Kibbee's decision to forward Norton's e-mail to Bandaragoda despite not believing it was a true threat "further shows how she lost objectivity in this case."  The trial court did not err in disregarding Kibbee's testimony.

DVPO

Bandaragoda argues that the trial court erred by issuing a five-year DVPO

protecting Norton and K.B.[2,3] We disagree.

We review a trial court's decision to grant a DVPO for abuse of discretion. *Rodriguez v. Zavala*, 188 Wn.2d 586, 590, 398 P.3d 1071 (2017). "An abuse of discretion is found when a trial judge's decision is exercised on untenable grounds or for untenable reasons, or if its decision was reached by applying the wrong legal standard." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). A trial court also abuses its discretion "if it applies the law incorrectly." *In re Custody of SA-M*, 17 Wn. App. 2d 939, 951, 489 P.3d 259 (2021). We review challenges to the trial court's findings of fact for substantial evidence. *Davis v. Arledge*, 27 Wn. App. 2d 55, 64, 531 P.3d 792 (2023). "Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011).

---

[2] Bandaragoda argues that the trial court erred in ruling that he did not prove by a preponderance of the evidence that the DVPO should not be renewed. Under RCW 7.105.405(4)(a), a trial court must renew a DVPO unless the restrained person can prove "by a preponderance of the evidence that there has been a substantial change in circumstances" and that the restrained party "will not resume acts of domestic violence against the petitioner [or the petitioner's minor children] when the order expires." But the trial court expressly declined to renew the original DVPO, instead entering a new DVPO under the dissolution cause number. Bandaragoda's arguments are entirely inapposite. In any event, the court determined that Norton was more credible and expressed doubt that Bandaragoda had really changed.

[3] Norton contends that Bandaragoda's attorney agreed during the court hearing that the DVPO should be renewed to protect Norton and that he only disputed whether K.B. should be included and the duration of the renewal. She asserts that Bandaragoda is prohibited from challenging the renewal of the DVPO for the first time on appeal. *See* RAP 2.5(a). But the court did not renew the original DVPO; it entered an entirely new DVPO under the dissolution cause number. We decline to apply RAP 2.5(a) here.

RCW 26.09.050(1) authorizes the court in a family law action to "make provision for the issuance within this action of the restraint provisions of a domestic violence protection order or an antiharassment protection order." The one-year limit on protection orders that limit contact with a respondent's minor children does not apply to orders issued under chapter 26.09 RCW. RCW 7.105.315(2)(a).

Under RCW 7.105.225(1)(a), a trial court must issue a DVPO if it finds by a preponderance of the evidence that "the petitioner has been subjected to domestic violence by the respondent." "Domestic violence" is defined as "[p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; coercive control; unlawful harassment; or stalking of" an intimate partner, family member, or household member by the same. Former RCW 7.105.010(9)(a), (b) (2022). A parent's fear for the safety of their child is a legitimate basis to grant a DVPO, and a child's exposure to domestic violence against a parent "constitutes domestic violence under [former] chapter 26.50 RCW." *Rodriguez*, 188 Wn.2d at 598.

Here, the trial court based its decision to grant a five-year DVPO protecting Norton and K.B. "based upon the findings of the Court previously made with regards to the domestic violence in the home and the length of it and the extent of it." Ample evidence supports this finding.

Bandaragoda argues that the DVPO impermissibly overlaps with the parenting plan insofar as it affects his time with K.B. He is incorrect. The DVPO

prohibits Bandaragoda from harming K.B., but it expressly does not prohibit contact. Instead, contact is governed by the parenting plan. Given Bandaragoda's history of domestic violence, the court did not abuse its discretion in prohibiting him from harming K.B. Bandaragoda also claims that the DVPO could result in him being targeted by immigration raids. But Bandaragoda is a United States citizen, and no authority supports the proposition that fear of being taken into custody should be considered as a factor when deciding whether to issue a DVPO. The court did not abuse its discretion.

### Attorney Fee Award at Trial

Bandaragoda claims that the trial court erred in awarding Norton $115,000 in attorney fees. An award of attorney fees and costs is within the discretion of the trial court, and we review the court's decision for abuse of that discretion. *Crosetto*, 82 Wn. App. at 563. The party challenging the award must establish that the court exercised its discretion in a manner that was "clearly untenable or manifestly unreasonable." *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994).

A court may award attorney fees and costs in a civil action if a statute, an agreement of the parties, or a recognized equitable ground authorizes the award. *In re Marriage of Greenlee*, 65 Wn. App. 703, 707, 829 P.2d 1120 (1992). In a dissolution action, the trial court may "after considering the financial resources of both parties," order one party to pay the other party's attorney fees. RCW 26.09.140. In determining whether to award fees under RCW 26.09.140, the trial

court compares each party's relative need and ability to pay. *In re Marriage of Spreen*, 107 Wn. App. 341, 351, 28 P.3d 769 (2001).

Separate from this statutory basis, a trial court may also "consider whether additional legal fees were caused by one party's intransigence and award attorney's fees on that basis." *Greenlee*, 65 Wn. App. at 708. When awarding fees for intransigence, the court should segregate the fees caused by the intransigence from those incurred for other reasons. *Crosetto*, 82 Wn. App. at 565. But segregation is not required where the spouse's " 'bad acts permeated the entire proceeding.' " *In re Marriage of Bresnahan*, 21 Wn. App. 2d 385, 411, 505 P.3d 1218 (2022) (quoting *In re Marriage of Sievers*, 78 Wn. App. 287, 312, 897 P.2d 388 (1995)).

Here, the court's oral ruling plainly indicates that it awarded attorney fees to Norton on both alternative bases:

> With regard to attorney fees and costs, in a dissolution proceeding, the principal considerations for an attorney's fees award are need, ability to pay and equity as indicated [in] *In re the Marriage of Van Camp*. . . . The Court based on the testimony finds that [Norton] has established that she has a financial need and that [Bandaragoda] has the ability to pay.

> Further, a party's intransigence provides an equitable basis for which a trial court may award attorney fees pursuant to *In re Marriage of Chandola*. . . . The Court finds that four years have passed since the filing of the petition, and [Bandaragoda] has engaged in foot dragging, refusing to cooperate with opposing party regarding custody issues, frivolous oppositions to continuances for medical concerns of opposing counsel, bringing frivolous protection orders, attempts to rewrite the narrative through manipulation, parental alienation, et cetera, which based on the testimony and evidence created greater costs in this dissolution, and not merely financial costs.

Bandaragoda contends that the trial court erred in awarding fees under RCW 26.09.140 because Norton supported her request with attorney fee invoices and affidavits, which the trial court erred in admitting during trial under the business records exception to the rule against hearsay. "The trial judge's decision to admit or exclude business records is given great weight and will not be reversed unless there has been a manifest abuse of discretion." *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990).

> The business records exception to the hearsay prohibition states:
>
> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020. Under this rule, business records are admissible even if they contain hearsay when they are created in the ordinary course of business and no evident motive to falsify exists. *Lodis v. Corbis Holdings, Inc.*, 172 Wn. App. 835, 859, 292 P.3d 779, 793 (2013); RCW 5.45.020.

Bandaragoda insists that attorney invoices and fee affidavits are outside the scope of the business records exception because they are "inherently prepared in anticipation of litigation." But as Bandaragoda candidly admits, no Washington authority supports this proposition. To the contrary, law firms typically invoice their clients in the regular course of business and courts routinely consider such records when ruling on attorney fees. The trial court did not err in admitting Norton's fee invoices and affidavits under the business

records exception. And Bandaragoda does not dispute the court's determination about Norton's need and his ability to pay. Ample evidence supported the trial court's decision to award $115,000 in attorney fees to Bandaragoda under RCW 26.09.140.

Bandaragoda also asserts that the attorney award should be reversed to the extent it was based on intransigence. He contends that the court failed to find that his intransigence permeated the proceedings and the record does not support such a finding. Because we hold that the court did not err in awarding fees based on RCW 26.09.140, we need not consider intransigence as an alternative basis.

### Attorney Fee Award on Appeal

Norton requests an award of attorney fees and costs on appeal under RCW 26.09.140. We may award fees on appeal under RAP 18.1(a) if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review" and the party properly requests it.

RCW 26.09.140 provides that on appeal, "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." In determining whether to grant attorney fees on this basis, we consider " 'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting *In re the Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)). Applying these

principles, we deny Norton's request for an award of attorney fees and costs under RCW 26.09.140.

Norton also claims that Bandaragoda's "misleading," "baseless" and "frivolous" arguments to this court are a basis to award attorney fees. BOR at 47. Although Norton does not cite it, RAP 18.9(a) authorizes us to award sanctions when a party files a frivolous appeal. "An appeal is frivolous if there are no debatable issues on which reasonable minds might differ and it is so totally devoid of merit that there is no reasonable possibility of reversal." *In re Marriage of Schnurman*, 178 Wn. App. 634, 644, 316 P.3d 514 (2013). Bandaragoda's claims as a whole were not frivolous, so sanctions under RAP 18.9(a) are inappropriate.

We affirm in part but remand for the court to recalculate Bandaragoda's child support obligation after inclusion of the maintenance award in the parties' income. On remand, the court may reconsider the maintenance award.

WE CONCUR: